## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

_____
                                        )
**FRANK B. DAY and ARTHUR WONG,**       )
                                        )
    **Plaintiffs/Counterclaim Defendants,**   )
                                        )
    **v.**                             )    **Civil Action No. 2013-0044**
                                        )
**ROBERT WHITE a/k/a ROBERT W. WHITE,**  )
                                        )
    **Defendant/Counterclaimant.**      )
_____)

**Attorneys:**
**Kevin A. Rames, Esq.,**
St. Croix, U.S.V.I.
    *For the Plaintiffs/Counterclaim Defendants*

**Andrew C. Simpson, Esq.,**
**Emily A. Shoup, Esq.,**
St. Croix, U.S.V.I.
    *For the Defendant/Counterclaimant*


## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER is before the Court on a series of filings in this case. In chronological order by filing date, they are: the Notice of *Lis Pendens* (Dkt. No. 4) that Defendant/Counterclaimant Robert White filed with the Recorder of Deeds in connection with his Counterclaim; Plaintiffs/Counterclaim Defendants Frank B. Day and Arthur Wong's "Motion . . . to Strike Defendant/Counterclaimant's Jury Demand; to Expunge his Notice of *Lis Pendens* and to Dismiss his Counterclaim" (Dkt. No. 17); Defendant/Counterclaimant's Motion for Summary Judgment (Dkt. No. 19); Plaintiffs' "Consent Motion for Extension of Time to Respond to Robert W. White's Motion for Summary Judgment" (Dkt. No. 29); Plaintiffs'

"Motion for Summary Judgment Concerning White's Counterclaim" (Dkt. No. 39); Plaintiffs' "Motion to Reconsider Court Order . . . Granting Frank White's Motion to Stay Briefing for Opposition to Summary Judgment" (Dkt. No. 43); and Plaintiffs' Motion for Summary Judgment concerning the Bank of St. Croix Loan (Dkt. No. 44). Because of the interrelatedness of these motions, they will all be addressed in this Memorandum Opinion.

For the reasons discussed below, the Court will grant both of Plaintiffs' Motions for Summary Judgment as they pertain to their entitlement to damages (Dkt. Nos. 39, 44), as well as their Motion to Dismiss Defendant's Counterclaim (Dkt. No. 17); deny Defendant's Motion for Summary Judgment (Dkt. No. 19); order the release of Defendant's *Lis Pendens* (Dkt. No. 4); deny as moot Plaintiffs' Motion to Strike Defendant's Jury Demand and to Expunge Defendant's *Lis Pendens* (Dkt. No. 17); grant, *nunc pro tunc*, Plaintiffs' "Consent Motion for Extension of Time to Respond to Robert W. White's Motion for Summary Judgment" (Dkt. No. 29); and deny as moot Plaintiffs' "Motion to Reconsider Court Order . . . Granting Frank White's Motion to Stay Briefing for Opposition to Summary Judgment" (Dkt. No. 43). The Court's grant of Plaintiffs' Motions for Summary Judgment herein addresses their *entitlement* to damages only. The relief provided does not include a determination as to the specific amount of damages to be awarded. Such amount must be established with specificity by Plaintiffs in further proceedings, with the opportunity for Defendant to respond.

## I.      BACKGROUND

### A.      Factual Background[1]

In September 2000, Defendant Robert White acquired title to Plot 132 of Estate Green Cay in St. Croix (the "Property"). (Dkt. No. 53 at 3). A loan in the amount of $195,000, executed

---

[1] The factual background is taken from documents filed in connection with the three Motions for Summary Judgment and Plaintiffs' Motion to Strike.

with the purchase of the Property, was secured by a First Priority Mortgage on the Property and a promissory note. (*See* Dkt. No. 18, Exh. 1 at 3, 18).

The business relationship between the parties that gave rise to this lawsuit dates back to March 2002, when Plaintiffs Frank B. Day and Arthur Wong, along with eight other investors, entered into a joint venture agreement to provide Defendant with funds to design and build a luxury speculative home on the Property for eventual sale. (Dkt. No. 53 at 3). The joint venture initially provided Defendant with $600,000, secured by a Second Priority Mortgage on the Property and a promissory note. (Dkt. No. 18, Exh. 1 at 3-38). Over the next three years, the joint venture extended four more credit facilities to Defendant, memorialized in modification agreements and totaling an additional $350,000. (*See id.*, Exh. 1 at 39-47; Exh. 2 at 1-25). All five credit facilities were to mature in March 2005 or upon sale of the Property—whichever occurred first. (*Id.*, Exh. 2 at 20).

By March 2005, the Property remained unsold, and the credit facilities matured without payment by Defendant. (*Id.* at 20-21; Exh. 3 at 1). On September 15, 2005, Plaintiffs and Defendant jointly borrowed $1,650,000 from the Bank of St. Croix (the "BSC Loan"). (*Id.*, Exh. 2 at 44-46; Dkt. No. 53 at 3-4). The BSC Loan, which was secured by a First Priority Mortgage on the Property, (Dkt. No. 18, Exh. 2 at 27-41), was used, *inter alia*, to buy out the other investors of the joint venture, leaving Plaintiffs and Defendant as the remaining members with interest in the Property. (Dkt. Nos. 21 and 33 at ¶¶ 8-9). In addition to executing the BSC Loan, Plaintiffs extended a sixth credit facility to Defendant in the amount of $500,000 (the "Wong/Day Loan"), secured by a Second Priority Mortgage on the Property. (Dkt. No. 18, Exh.

2 at 48-65, Exh. 3 at 1-4).[2] The Wong/Day Loan was to be used, *inter alia*, to make payments on the Property's mortgages, the BSC Loan, and property taxes. (*Id.*, Exh. 3 at 1).

In April 2006, Defendant was in arrears on the BSC Loan and the Wong/Day Loan, and had failed to obtain property and liability insurance as required under the BSC Loan. (*See id.* at 6). The parties negotiated a settlement in exchange for Plaintiffs' agreement to refrain from taking legal action against Defendant. (*See id.* at 6-7). The terms of the settlement involved an additional loan of $300,000 from Plaintiffs to Defendant. This additional loan was consolidated with the original Wong/Day Loan of $500,000 and accrued interest of $42,008, for a total of $842,008 (the "Amended Wong/Day Loan"). (*Id.* at 7).[3] The parties memorialized the terms of the settlement in: (1) a Settlement Agreement (*id.* at 6-14); (2) a Release Agreement (*id.* at 15-19); (3) a Security Agreement (*id.* at 20-32); and (4) a Deed in Lieu of Foreclosure (*id.* at 33-36).

The Settlement Agreement recites the BSC Loan and the Wong/Day Loan amounts in Sections A through C. (*Id.* at 6). It states that Defendant was in default of his obligations on both loans. (*Id.*). Section D states, *inter alia*, that Defendant "needs additional funds to pay the BSC Note," and Sections E and F state, *inter alia*, that Plaintiffs agree to "refrain from taking legal action against [Defendant] . . . but only under the provisions contained herein." (*Id.* at 6-7). The Settlement Agreement requires that the additional $300,000 loan be used for payments due under the BSC Loan and outstanding bills, and to purchase property insurance. (*Id.* at 7). Further, Section 2.1.2 states, in part: "when the additional $300,000 loan proceeds have been exhausted,

---

[2] The BSC Loan and Wong/Day Loan carry interest rates of 7.0% and 15.0% per year, respectively. (Dkt. No. 18, Exh. 2 at 44, Exh. 3 at 1).

[3] The Amended Wong/Day Loan was secured by an amended promissory note and constituted the seventh credit facility extended to Defendant. (*See* Dkt. No. 18, Exh. 3 at 38-41).

[Defendant] shall be solely responsible for paying any indebtedness owed to Bank of St. Croix." (*Id.* at 7-8).[4]

The Settlement Agreement contemplated that the Property would either be sold or remain unsold by April 1, 2008, the maturation date of the Amended Wong/Day Loan. (*See id.* at 8-9). Pursuant to Section 2.2, the Deed in Lieu of Foreclosure would be held in escrow by a designated agent. (*Id.* at 8). If Defendant were to sell the Property before April 1, 2008, the Settlement Agreement specifies the prioritization for payments from the sale's proceeds. (*Id.* at 8-9).[5] Should Defendant pay all outstanding debts under the BSC Note and the Amended Wong/Day Note by April 1, 2008—but not sell the Property—the escrow agent would return the Deed in Lieu of Foreclosure to him. (*Id.* at 8). In the event of Defendant's default on payments due under either the Amended Wong/Day Loan or the BSC Loan prior to April 1, 2008, the escrow agent would deliver the Deed in Lieu of Foreclosure to Plaintiffs, and Defendant would lose all interest—including future sales proceeds—in the Property. (*Id.* at 8, 11; Dkt. No. 53 at 5).

In conjunction with the Settlement Agreement, the parties signed a Release Agreement, the terms of which would become effective only if the Deed in Lieu of Foreclosure was delivered

---

[4] The Settlement Agreement governs the liability and relationship between Plaintiffs and Defendant, and did not affect the Bank of St. Croix's rights as creditor. At the time of executing the Settlement Agreement, both Defendant and Plaintiffs remained the borrowers of record, and the Bank of St. Croix the creditor of record, on the BSC Loan. (*See* Dkt. No. 18, Exh. 3 at 38, 47).

[5] Specifically, the sales proceeds were to be distributed as follows: (1) to pay closing costs related to the sale; (2) to Defendant to pay for a construction warranty fee; (3) to pay in full any indebtedness "under the BSC Loan Documents"; (4) to pay in full any indebtedness "owed to Wong/Day under the Loan Documents"; (5) to pay Defendant a sum of $250,000; and (6) with any remaining proceeds to be divided and paid 90% to Defendant and 10% to the joint venture. (*See* Dkt. No. 18, Exh. 3 at 8-9).

to Plaintiffs after a default by Defendant. (Dkt. No. 18, Exh. 3 at 15).[6] Section A recites the parties' agreement that should Defendant default on his obligations outlined in the Settlement Agreement, the Deed in Lieu of Foreclosure would be delivered to Plaintiffs "in satisfaction of [Defendant's] obligations under the Wong/Day Loan Documents . . . evidencing and securing the $842,000.08 loan." (*Id.*).[7]

Section 2.0 contains a release by Plaintiffs of Defendant from "any and all liability and other obligations under the Wong/Day Loan Documents, subject to the provisions of [the Release] Agreement." (*Id.*). Section 3.0 contains a release by Defendant of Plaintiffs from claims and liabilities arising out of the "Loan Documents." (*Id.* at 15-16).[8] Section 4 lists three types of events that would void the release in Section 2.0 and render Defendant liable for "the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement," including, in Section 4.1(a), if Defendant should act as an adverse party to Plaintiffs in a suit relating to the validity of the Deed in Lieu of Foreclosure, the Wong/Day Loan Documents, or the BSC Loan. (*Id.* at 16). Finally, Section 5.0 of the Release Agreement states:

> [A]cceptance by [Plaintiffs] of ownership of the Property pursuant to the terms of the Settlement Agreement, this Agreement and the Deed in Lieu of Foreclosure will not create any obligation on the part of [Plaintiffs] to third parties which might have claims of any kind whatsoever against [Defendant] or the Property and . . . [Plaintiffs] do[] not assume or agree to discharge any liabilities pertaining

---

[6] If Defendant paid off the BSC Note and the Amended Wong/Day Note by April 1, 2008 such that the Deed in Lieu of Foreclosure was returned to him, the Release Agreement would be destroyed. (Dkt. No. 18, Exh. 3 at 8).

[7] The Settlement Agreement defines "Wong/Day Loan Documents" to encompass "the Wong/Day Note, Wong/Day Mortgage and other loan documents evidencing, securing, or otherwise signed in connection with the Wong/Day Note." (Dkt. No. 18, Exh. 3 at 6).

[8] The Settlement Agreement defines "Loan Documents" to encompass "[t]he original Wong/Day Loan Documents, this Settlement Agreement, the Wong/Day Amended Note, Wong/Day Amended Mortgage, and all the other documents described herein and/or signed in connection herewith." (Dkt. No. 18, Exh. 3 at 8).

to the Property which originated prior to the effective date of this Agreement, except the BSC Loan.

(*Id.* at 16-17).

The additional $300,000 loan proceeds were disbursed. (*See* Dkt. No. 32, Exh. 1 at 2; Dkt. No. 35 at 1). Defendant did not sell the Property by April 1, 2008, or otherwise pay off the BSC Loan or the Amended Wong/Day Loan. (Dkt. Nos. 21 and 33 at ¶ 14).

In November 2012, Plaintiffs sent a certificate of default to the escrow agent, stating that Defendant was "in continuing default of his payment obligations under Section 2 of the Settlement Agreement." (Dkt. No. 18, Exh. 3 at 43-45). The Deed in Lieu of Foreclosure was delivered to Plaintiffs and recorded, in accordance with the terms of the Settlement Agreement. (Dkt. Nos. 21 and 33 at ¶ 15). The terms of the Release Agreement became effective when Plaintiffs accepted delivery of the Deed in Lieu of Foreclosure. (Dkt. Nos. 21 and 33 at ¶ 16).

In early April 2013, Plaintiffs purchased and were assigned the rights to the BSC Loan from the Bank of St. Croix, for consideration in the amount of $1,465,132.12. (Dkt. No. 18, Exh. 3 at 47-49). On April 15, 2013, Plaintiffs demanded that Defendant pay "all amounts due and owing under the [BSC Loan], given [Defendant's] commitment in the Settlement Agreement." (*Id.*, Exh. 4 at 6-8). Having received no payment from Defendant, on April 30, 2013, Plaintiffs filed this action for the debt and interest outstanding on the BSC Loan. (Dkt. No. 1).

**B.      Procedural Background**

Plaintiffs' original Complaint alleged that Defendant owes the outstanding balance of the BSC Loan, totaling $1,465,132.12 with 7.0% interest accruing per annum. (Dkt. No. 1 at 2). Defendant filed an Answer and Counterclaim, alleging that he understood the delivery of the Deed in Lieu of Foreclosure to Plaintiffs in 2012 to have satisfied all debts and liabilities to Plaintiffs and on the BSC Loan. (Dkt. No. 3 at ¶ 28). In his Counterclaim, Defendant seeks: (1)

reformation of the Settlement Agreement and related documents in accordance with his understanding; (2) compensatory and punitive damages for Plaintiffs' alleged breach of fiduciary duty as joint venture members; and (3) compensatory and punitive damages for Plaintiffs' alleged breach of the duty of good faith and fair dealing implied from the joint venture agreement. (*Id.* at 11). Defendant also requests a jury trial on all issues so triable. (*Id.*). In addition to his Counterclaim, Defendant filed a *lis pendens* with the Recorder of Deeds, noticing the encumbrance this litigation places on the Property. (Dkt. No. 4; Dkt. No. 18, Exh. 4 at 9-10).

In a consolidated filing, Plaintiffs moved to: strike Defendant's jury demand for his Counterclaim on the ground that Defendant waived his right in the Settlement Agreement; dismiss the Counterclaim as barred by the Release Agreement; and expunge the *lis pendens*, arguing that Defendant's Counterclaim does not affect the Property's title. (Dkt. No. 17). Defendant then filed a motion for summary judgment on the Complaint. (Dkt. No. 19).[9]

Plaintiffs also filed a "Motion to Amend Complaint," seeking to add a claim for the outstanding balance of the Amended Wong/Day Loan on the ground that Defendant, by filing his Counterclaim, breached Section 4.1(a) of the Release Agreement and thereby entitled Plaintiffs to seek collection on the loan. (Dkt. No. 23; Dkt. No. 24 at 2-3). The Court granted Plaintiffs' Motion to Amend (Dkt. No. 26) and Plaintiffs filed a First Amended Complaint requesting the full amounts of both the BSC Loan and the Amended Wong/Day Loan (Dkt. No. 36). Defendant answered Plaintiffs' First Amended Complaint. (Dkt. No. 37).

Plaintiffs then filed a "Motion for Summary Judgment Concerning White's Counterclaim," seeking summary judgment on their claim regarding the Amended Wong/Day

---

[9] Associated with Defendant's Motion is Plaintiffs' "Consent Motion for Extension of Time to Respond to Robert W. White's Motion for Summary Judgment" (Dkt. No. 29), which the Court will grant *nunc pro tunc*.

Loan, asserted in the First Amended Complaint. (Dkt. No. 39).[10] After the Court stayed briefing on this Motion, Plaintiffs moved for summary judgment on their claim regarding the BSC Loan. (Dkt. No. 44).[11]

On July 15, 2015, the Court held a hearing regarding the pending motions for summary judgment and to dismiss. (*See* Dkt. No. 61). Following the hearing, the Court lifted the stay on briefing related to Plaintiffs' "Motion for Summary Judgment Concerning White's Counterclaim." (Dkt. No. 62).[12]

In their cross Motions for Summary Judgment regarding Plaintiffs' claim for the outstanding BSC Loan balance, and at the July 15, 2015 hearing, the parties agreed that no genuine issue of material fact exists. However, both Plaintiffs and Defendant claimed that they were entitled to judgment in their favor based on the language of the contracts at issue. (*See* Dkt. No. 20 at 2 n.2 (Defendant, in support of his Motion, stating that "summary judgment is appropriate now because the issues raised are a matter of interpretation of an unambiguous

---

[10] In response to Plaintiffs' Motion for Summary Judgment Concerning the Counterclaim (Dkt. No. 39), Defendant filed a "Motion to Suspend Deadline for Filing his Opposition to Motion for Summary Judgment." (Dkt. No. 41). Defendant asserted that Plaintiffs' pending Motion to Dismiss Defendant's Counterclaim (Dkt. No. 17) and Defendant's Motion for Summary Judgment on the Complaint (Dkt. No. 19)—which had been fully briefed—would either render moot Defendant's Counterclaim or dismiss it in its entirety. (Dkt. No. 41 at 1). The Court granted Defendant's Motion to Suspend and stayed briefing on Plaintiffs' Motion pending further Order of the Court. (Dkt. No. 42). Plaintiffs moved for reconsideration of the Court's Order granting Defendant's Motion to Suspend. (Dkt. No. 43).

[11] In response to Plaintiffs' Motion for Summary Judgment concerning the BSC Loan (Dkt. No. 44), Defendant filed a "Motion to Suspend Deadline for Filing his Opposition to Plaintiffs' Second Motion for Summary Judgment," asserting that prior briefing was sufficient to address Plaintiffs' Motion (Dkt. No. 48). The Court denied Defendant's motion. (Dkt. No. 51).

[12] In view of the Court's Order lifting the stay on briefing following oral argument on July 15, 2015, the Court will deny as moot Plaintiffs' Motion for Reconsideration (Dkt. No. 43) of the Court's Order granting Defendant's Motion to Suspend.

contract"); Dkt. No. 45 at 1 (Plaintiffs, in support of their Motion, stating that "[t]he material facts of this litigation are not in dispute")).

As discussed below, because the Court finds that Plaintiffs are entitled to judgment on the BSC Loan claim as a matter of law, it will grant their Motion for Summary Judgment (Dkt. No. 44) and deny Defendant's Motion for Summary Judgment (Dkt. No. 19). The Court will also grant the Plaintiffs' Motion to Dismiss Defendant's Counterclaim (Dkt. No. 17) based on Defendant's waiver in the Release Agreement. Finally, the Court will grant Plaintiffs' "Motion for Summary Judgment Concerning White's Counterclaim" (Dkt. No. 39).[13]

## II.   DISCUSSION

### A.   Cross Motions for Summary Judgment on Plaintiffs' Claim Regarding the BSC Loan

Defendant moved for summary judgment on Plaintiffs' original Complaint, which contained a claim for collection on the BSC Loan. (Dkt. No. 19). Defendant argues that, based on Section 5.0 of the Release Agreement, Plaintiffs agreed to "assume and discharge" the BSC Loan upon the transfer of the Deed in Lieu of Foreclosure from Defendant to Plaintiffs. (Dkt. No. 20 at 5).

Plaintiffs have also moved for summary judgment on the claim regarding the BSC Loan. (Dkt. No. 44). Plaintiffs argue that nothing in the Release Agreement amends or obviates Defendant's commitment in Section 2.1.2 of the Settlement Agreement to assume sole responsibility for the BSC Loan as between the parties. (Dkt. No. 45 at 3-4).

---

[13] Based on the Court's dismissal of Defendant's Counterclaim, the Court will order the *lis pendens* released and deny as moot Plaintiffs' Motion to Expunge Defendant's Notice of *Lis Pendens* and Plaintiffs' Motion to Strike Defendant's Jury Demand (Dkt. No. 17).

The Court finds that Plaintiffs' position reflects the terms of the Settlement Agreement and the Release Agreement. The Court will therefore grant summary judgment in Plaintiffs' favor on their claim that Defendant is solely responsible for the BSC Loan.

### 1.    Motion for Summary Judgment Legal Standard

To prevail on a motion for summary judgment, a movant must show that there is "no genuine dispute as to any material fact," such that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[14] In opposition, the non-moving party may cite materials in the record to demonstrate that the movant has failed to show that there is no genuine question of material fact. Fed. R. Civ. P. 56(c). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if a reasonable jury could return a verdict for the nonmoving party." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citation and internal quotation marks omitted) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If a conflict arises between the evidence presented by both sides, a court must accept as true the allegations of the non-moving party and give the non-moving party the benefit of every reasonable inference that can be drawn from the record. *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010); *Airlines Reporting Corp. v. Belfon*, 2010 WL 3664065, at *22 (D.V.I. Sept. 16, 2010).

The Release Agreement and Settlement Agreement at issue herein are contracts, and therefore the determination of whether a party is entitled to judgment as a matter of law requires

---

[14] The legal standard remains unchanged on cross motions for summary judgment; each movant must meet the standard articulated herein in order to prevail on their respective motion. *See BA Properties, Inc. v. Aetna Cas. & Sur. Co.*, 273 F. Supp. 673, 677 (D.V.I. 2003) ("It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (quoting *Manteas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976)).

the Court to examine the terms of each contract. *See United Corp. v. Tutu Park, Ltd.*, 55 V.I. 702, 2011 WL 4017711, at *2 (V.I. 2011). To conclude that a party is entitled to judgment as a matter of law, the Court must first determine whether the "contract is so clear that it can be read only one way." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073-74 (3d Cir. 1997) (citing *American Flint Glass Workers Union v. Beaumont Glass Co.*, 62 F.3d 574, 580-81 (3d Cir. 1995)). Whether ambiguity exists is a question of law and, when the terms of a contract are unambiguous, the issue of the meaning of those terms is also a question of law. *United Corp.*, 2011 WL 4017711, at *2; *White v. Spenceley Realty, LLC*, 53 V.I. 666, 2010 WL 4961792, at *5 (V.I. 2010).

A court may consider extrinsic evidence to decide whether contractual language is ambiguous. *United Corp.*, 2011 WL 4017711, at *2. If "the extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide at the summary judgment stage." *White*, 2010 WL 4961792, at *5 (quoting *In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 241 (3d Cir. 1995)). Where there is no factual dispute and the contract, with the extrinsic evidence, unambiguously indicates that one party is entitled to judgment as a matter of law, summary judgment in that party's favor is appropriate. *Id.*

## 2.    Analysis

The parties do not dispute the authenticity of the documents attached to Defendant's Motion for Summary Judgment on Plaintiffs' claim regarding the BSC Loan, which include the Release Agreement and the Settlement Agreement. In addition, in their written submissions, Plaintiffs and Defendant agree that there is no genuine dispute of material fact. (Dkt. No. 20 at 2 n.2; Dkt. No. 45 at 1). Further, the parties agreed at the July 15, 2015 hearing that, because there is no factual dispute, the interpretation of the contracts should be decided as a matter of law.

The Court has independently examined the record, including the parties' pleadings; the contracts and documents filed in connection with the motions currently before the Court; and the parties' three sets of Statements of Uncontested Material Facts and responses thereto. (*See, e.g.*, Dkt. No. 18, Exhs. 1-4; Dkt. No. 21; Dkt. No. 33; Dkt. No. 45, Exh. 1; Dkt. No. 53; Dkt. No. 64); *see also Virgin Islands Taxi Assoc. v. Virgin Islands Port Authority*, 59 V.I. 148, 2014 WL 4027454, at *4 (V.I. Super. Ct. Aug. 1, 2013) (a court should not simply accept the parties' belief that no genuine issues of material fact exist). The Court concludes that there is no genuine issue of material fact and turns to the construction of the Settlement Agreement and Release Agreement to determine which movant is entitled to judgment as a matter of law on Plaintiffs' claim regarding the BSC Loan. *See Adams v. Knight*, 48 V.I. 39, 2006 WL 2796787, at *2 (V.I. Super. Ct. Aug. 24, 2006) (agreeing with the parties' assertion that no genuine issues of material fact exist and addressing ownership of a deed as a matter of law).

The parties' dispute revolves around their respective interpretations of Section 2.1.2 of the Settlement Agreement and Section 5.0 of the Release Agreement. "In examining a contract, the Court is to interpret the contracting parties' intent as objectively manifested by them." *Sunshine Shopping Center, Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000). "[T]he strongest external sign of an agreement between the parties is the words they choose to use in the written contract." *Citibank, N.A. v. Chammah*, 44 V.I. 85, 2001 WL 1568553, at *3 (V.I. Terr. 2001); *see Chapin v. Great Southern Wood Preserving Inc.*, 2014 WL 4932328, at *4 (D.V.I. Sept. 30, 2014) ("The strongest objective manifestation of intent is the language of the contract.") (citation omitted). "Thus, a court must construe the contract in the light of the plain meaning of its words." *Citibank, N.A.*, 2001 WL 1568553, at *3.

When determining a contractual provision's meaning, a Court must "read the contract as a whole, putting its terms in context." *Lovern v. Jackson*, 2015 WL 494069, at *15 (D.V.I. Feb. 3, 2015); *see Weary v. Long Reef Condominium Assoc*, 57 V.I. 163, 2012 WL 2924122, at *4 (V.I. July 13, 2012) (stating that contractual provisions "are construed according to their plain meaning within the context of the document as a whole"). "A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Sunshine Shopping Center, Inc.*, 85 F. Supp. 2d at 540 (quotation and citation omitted); *see Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986) ("It is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, [with] each [document] contributing to the ascertainment of the true intent of the parties."). Sub-provisions of a contract are not to be read so as to conflict with the overall purpose of the agreement. *See In re G-I Holdings, Inc.*, 755 F.3d 195, 205 (3d Cir. 2014) ("If a meaning that arises from one portion of the agreement conflicts with the agreement's overall scheme or plan, it cannot control.") (internal quotation and citation omitted); *see also Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1131 (3d Cir. 1969) (ambiguous ancillary provision cannot be read so as to vary unambiguous purpose of contract).

Accordingly, the provisions at issue—Section 2.1.2 of the Settlement Agreement and Section 5.0 of the Release Agreement—will be read against the backdrop of the Settlement Agreement, the Release Agreement, the parties' business relationship at the time of contracting in April 2006, and their purpose in entering into the Loan Documents.

### a.     Settlement Agreement

Section 2 of the Settlement Agreement describes each party's performance. In Section 2.1, the parties "agree to capitalize the Unpaid Interest and add it to the unpaid principal balance due under the Wong/Day Loan Documents and [Plaintiffs] will lend [Defendant] an additional $300,000 pursuant to the provisions of this Agreement." (Dkt. No. 18, Exh. 3 at 7). The total amount Defendant owed to Plaintiffs in the Amended Wong/Day Loan was therefore $842,008. (*Id.*). Section 2.1.2 then states that "when the additional $300,000 loan proceeds have been exhausted, [Defendant] shall be *solely responsible for paying any indebtedness owed to Bank of St. Croix*." (*Id.* at 7-8) (emphasis added). The parties agree that the $300,000 loan proceeds were disbursed and exhausted. (*See* Dkt. No. 32, Exh. 1 at 2; Dkt. No. 35 at 1). Therefore, under the plain language of Section 2.1.2, at some point after April 2006 when the $300,000 was fully disbursed, Defendant became solely responsible for the debt outstanding on the BSC Loan.

The Settlement Agreement accounts for three possible outcomes related to the Property and the BSC Loan. First, Section 2.3 states that if Defendant should comply with all of his obligations under the BSC Loan and the Amended Wong/Day Loan—paying off both by April 1, 2008—then the Deed in Lieu of Foreclosure would be returned to Defendant from escrow. (Dkt. No. 18, Exh. 3 at 8). Second, Section 2.3.1 states that, if Defendant should default on payments due to Plaintiffs or the Bank of St. Croix, then the escrow agent would transfer the Deed in Lieu of Foreclosure to Plaintiffs. (*Id.*). In Section 2.4, a third possibility is detailed: if Defendant should sell the Property by April 1, 2008, the profits therefrom would be distributed in an order set forth in the Settlement Agreement. (*Id.* at 8-9). After closing costs and fees, the priority of payment was: to pay the BSC Loan; to pay the Wong/Day Loan; to pay Defendant a sum of $250,000; and to pay 90% of any remaining proceeds to Defendant and 10% to Plaintiffs. (*Id.*).

Section 2.1.2 provides that Defendant's failure to make payments on the BSC Loan constitutes a "material Event of Default" under the Settlement Agreement. (*Id.* at 8). In Section 15, the Settlement Agreement states that "[f]ollowing an Event of Default, [Plaintiffs] shall be entitled to immediately exercise any and all rights and remedies available under this Agreement, the Loan Documents, at law and/or in equity." (*Id.*). One such right was the transfer of the Deed in Lieu of Foreclosure to Plaintiffs. Thus, when Defendant defaulted on his obligations by not paying off the BSC Loan by April 1, 2008, and the Property had not been sold, the outcome set forth in Section 2.3.1 came into effect. Plaintiffs took possession of the Deed in Lieu of Foreclosure in 2012, four years after accrual of their right to do so under the Settlement Agreement.

There is no provision in the Settlement Agreement by which the transfer of the Deed in Lieu of Foreclosure absolved Defendant of his sole responsibility for the BSC Loan upon exhaustion of the $300,000 loan. The Court acknowledges that, in the normal course of a foreclosure, a bank would repossess the property that serves as collateral for the unpaid debt; sell the property; and use the proceeds to recover the monies owed, with the debtor liable for any deficiency. Here, however, the parties created the Deed in Lieu of Foreclosure to replace the normal foreclosure process for transfer of the Property, and created a separate document—the Release Agreement—to govern the terms of the Deed in Lieu of Foreclosure's transfer. That the parties contracted to alter the normal course of foreclosure or its equivalent is indicated in the Settlement Agreement.

Section 12 states that, upon transfer, "title to the Property shall remain subject to the BSC Mortgage and the other BSC Loan Documents and the Wong/Day Mortgage and the other Loan Documents except as set forth in the [R]elease Agreement." (Dkt. No. 18, Exh. 3 at 11). This

16

provision contains two pieces of information relevant to the Court's interpretation of the parties' contracts: (1) because the Settlement Agreement is one of the "Loan Documents,"[15] the parties intended its provisions to continue to govern the title to the Property; and (2) the Release Agreement's terms may modify terms in the Settlement Agreement.

The remaining issue, therefore, is whether the Release Agreement indicates that the parties intended that Defendant retain sole responsibility for the BSC Loan—pursuant to Section 2.1.2 of the Settlement Agreement—or whether the parties intended the Deed in Lieu of Foreclosure transfer to absolve Defendant of the obligation under Section 2.1.2 to bear sole responsibility for the BSC Loan. The Court concludes that the Release Agreement did not relieve Defendant of his obligation for the BSC Loan or transfer Defendant's responsibility for the BSC Loan to Plaintiffs.

### b.    Release Agreement

Consistent with Section 12 of the Settlement Agreement, the first line of Section A of the Release Agreement states that the terms of the Settlement Agreement are "incorporated herein by reference." (Dkt. No. 18, Exh. 3 at 15). Section A of the Release Agreement also states that the Deed in Lieu of Foreclosure was to be transferred "in satisfaction of [Defendant's] obligations under the Wong/Day Loan Documents . . . evidencing and securing the $842,008 loan from [Plaintiffs] to [Defendant]" upon default of Defendant's "obligations under the Loan Documents." (*Id.*). Section 2.0 of the Release Agreement contains the release of Defendant by Plaintiffs as to his obligations "under the Wong/Day Loan Documents, subject to the provisions of this Agreement." (*Id.*). The Settlement Agreement defines "Wong/Day Loan Documents" as: (1) the 2005 promissory note of $500,000; (2) the Second Priority Mortgage securing that note

---

[15] *See supra* note 8.

and encumbering the Property; and (3) "the other loan documents evidencing, securing, or otherwise signed in connection with the Wong/Day Note." (*Id.* at 6).

Defendant argues that the BSC Loan—on which Plaintiffs' Complaint was based (*see* Dkt. No. 1 at 2)—was "signed in connection with the Wong/Day Note," and, therefore, pursuant to Section A of the Release Agreement, the transfer of the Deed in Lieu of Foreclosure satisfied Defendant's obligation on the BSC Loan and, pursuant to Section 2.0 of the Release Agreement, Plaintiffs released Defendant of his BSC Loan responsibility. (*See, e.g.*, Dkt. No. 20 at 6 & n.4; Dkt. No. 64 at 2).

This argument is unavailing. First, the parties separately defined "BSC Loan Documents" and "Wong/Day Loan Documents" in the April 2006 Settlement Agreement, which was expressly incorporated into the Release Agreement. (Dkt. No. 18, Exh. 3 at 6, 15).[16] Second, the Release Agreement distinguishes the BSC Loan from "Wong/Day Loan Documents." Section 4.1(a) lists circumstances that nullify the release in Section 2.0, including if Defendant should act as an adverse party to Plaintiffs in a suit relating to, *inter alia*, "the Wong/Day Loan Documents" or "the BSC Loan." (*Id.* at 16). By separately referencing the BSC Loan and the Wong/Day Loan Documents, the parties did not equate the two, nor did they include the BSC Loan within the scope of the "loan documents . . . otherwise signed in connection with" the Wong/Day Loan. Had they done so, there would have been no need to separately reference the BSC Loan. Finally, the parties obviously knew how to create a broad, all-encompassing term if they so desired, as evidenced by their definition of "Loan Documents" in the Settlement Agreement to include "all the other documents described herein and/or signed in connection herewith." (*Id.* at 8).

---

[16] The Settlement Agreement defines "BSC Loan Documents" as "the BSC Note, Mortgage and the other loan documents evidencing, securing, or otherwise signed in connection with the BSC Note." (Dkt. No. 18, Exh. 3 at 6). The "Wong/Day Loan Documents" are separately defined as noted above.

Accordingly, the Court concludes that the BSC Loan is not encompassed within the term "Wong/Day Loan Documents."[17]

The Court finds that Section A of the Release Agreement is unambiguous:  the transfer of the Deed in Lieu of Foreclosure cured only Defendant's default on the Wong/Day Loan.[18] Section A includes no indication that the Release Agreement or the transfer of the Deed in Lieu of Foreclosure was intended to affect Defendant's obligations on the BSC Loan. Further, the Court concludes that the absence from Section 2.0 of a release of liability in favor of Defendant for the BSC Loan is another unambiguous indication that the Release Agreement was not intended to affect Defendant's obligations relating to the BSC Loan.

Next, Section 3.0 of the Release Agreement contains the release of Plaintiffs by Defendant as to any and all claims—"known or unknown"—arising out of the Loan Documents. (Dkt. No. 18, Exh. 3 at 15). The term "Loan Documents" encompasses the Wong/Day Amended Loan, the Settlement Agreement, the Deed in Lieu of Foreclosure, and any document "described" in the Settlement Agreement—the latter category, therefore, including the BSC

---

[17] The Court recognizes that there is a connection between the BSC Loan and the Wong/Day Loan in that one purpose of the Wong/Day Loan was to provide Defendant with funds to make monthly payments on the BSC Loan. (Dkt. No. 18, Exh. 3 at 1). Nonetheless, the Settlement Agreement unambiguously provides separate definitions for the two sets of transactional documents, and the Release Agreement unambiguously contains separate references to the two loans. To conclude that the BSC Loan is subsumed within the term "Wong/Day Loan Documents" would render meaningless the separate definitions and Section 4.1(a)'s reference to the BSC Loan, thus violating the "cardinal principle that each term of a contract should be given meaning so that no term is superfluous." *Dubrosky v. Colonia Life & Accident Ins. Co.*, 129 F. App'x 691, 693 (3d Cir. 2005).

[18] Sections A and 2.0 of the Release Agreement are consistent with Section 12 of the Settlement Agreement. Section 12 states that, upon transfer, title to the Property would remain subject to the "BSC Loan Documents and the Wong Day Mortgage and the other Loan Documents except as set forth in the [R]elease Agreement." (Dkt. No. 18, Exh. 3 at 11). Sections A and 2.0 acknowledge that the Deed in Lieu of Foreclosure transfer satisfied and released Defendant's obligations under the Wong/Day Loan Documents and therefore on the Wong/Day Mortgage. (*Id.* at 15).

Loan. (*See id.* at 15). Similarly, in Section 4.1(a), Defendant agreed to not bring suit against Plaintiffs "relating to . . . the BSC Loan," absent the consequence that Plaintiffs would be entitled to collect "the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement." (*Id.* at 16). These two provisions indicate that, notwithstanding the transfer of the Deed in Lieu of Foreclosure, Defendant retained responsibility for the BSC Loan as between the parties.

Section 8.0 of the Release Agreement states that "[n]either the Settlement Agreement, this Agreement and/or the Deed in Lieu of Foreclosure nor any of the provisions contained herein or therein can be waived, discharged, altered, amended or terminated, except by a written document signed by [Plaintiffs and Defendant]." (*Id.* at 17). Section 8.0 indicates that the parties did not intend the Release Agreement to impliedly waive or terminate terms of the Settlement Agreement. This provision supports the Court's conclusion that the parties intended Defendant's sole responsibility on the BSC Loan, established in Section 2.1.2 of the Settlement Agreement, to survive a default by Defendant, absent further negotiation and contracting by the parties beyond the Loan Documents.

Section 9.0 of the Release Agreement discusses the relationship between Plaintiffs and Defendant. It specifies that "no provision contained in the Settlement Agreement, this Agreement, or the Deed in Lieu of Foreclosure shall be deemed to . . . cause [Plaintiffs] to be liable or responsible in any way for the actions, liabilities, debts, or obligations of [Defendant] or any other person or entity." (*Id.* at 17). Section 9.0 clearly states that the parties did not intend the Release Agreement or the Deed in Lieu of Foreclosure to transfer Defendant's obligations to Plaintiffs. This provision supports the conclusion that the contracts at issue were not intended to transfer the obligation assumed by Defendant in 2.1.2 of the Settlement Agreement to Plaintiffs.

20

Finally, although Section 5.0 indicates that Plaintiffs assume or agree to discharge the BSC Loan, that clause cannot be read in isolation, but must be read as part of Section 5.0 as a whole. *Lovern*, 2015 WL 494069, at *15. Section 5.0 first states that acceptance of the Deed in Lieu of Foreclosure by Plaintiffs "will not create any obligations" on behalf of Plaintiffs to "third parties." (Dkt. No. 18, Exh. 3 at 16). Section 5.0 then states that Plaintiffs "do[] not assume or agree to discharge" any liabilities pertaining to the Property that predate the Release Agreement's effective date, "except the BSC Loan." (*Id.* at 16-17). Section 5.0 concludes by providing that "[n]o person or entity not a party to this Agreement will be a third party beneficiary or acquire any rights hereunder." (*Id.* at 17).

Significantly, Section 5.0 does not reference Section 2.1.2 of the Settlement Agreement—wherein Defendant assumed sole responsibility, as between the parties, for the BSC Loan. Rather than addressing obligations as between the parties, Section 5.0's topic sentence, which immediately proceeds the sentence with the "except" clause at issue, speaks to obligations to third parties. Given the third-party context in which the clause at issue appears, the Court concludes that Section 5.0 does not negate Defendant's assumption of sole responsibility, as between the parties, for the BSC Loan in Section 2.1.2 of the Settlement Agreement.

### c.    Context of April 2006 Settlement

The plain language of the contracts, as discussed above, is—without more—sufficient grounds upon which to grant judgment in favor of Plaintiffs on their claims regarding the BSC Loan. In addition, however, the Court's conclusion that Section 5.0 did not void Section 2.1.2 is further supported by the context in which the parties contracted.

The parties negotiated the Settlement Agreement, Release Agreement, and related documents after Defendant was in arrears on the BSC Loan and on the $500,000 Wong/Day

Loan that constituted the sixth credit facility issued to him by Plaintiffs. (Dkt. No. 18, Exh. 3 at 7). The parties' joint venture had initially loaned money to Defendant with the expectation that Defendant would repay the credit facility in three years—by March 2005. (*Id.*, Exh. 2 at 20). After the three years, the other eight investors exited the joint venture with the BSC Loan substituting for their investments, and with a $500,000 Wong/Day Loan from Plaintiffs to be used, *inter alia*, to make payments on the BSC Loan. (Dkt. No. 18, Exh. 2 at 44-46; Exh. 3 at 1-4; Dkt. Nos. 21 and 33 at ¶¶ 8-9). By April 2006, after the Wong/Day Loan had been fully disbursed, Defendant had failed, *inter alia*, to sell the Property or "pay payments due under the BSC [Loan]." (Dkt. No. 18, Exh. 3 at 6).

Section 2.1.2 of the Settlement Agreement unambiguously defines the responsibility for the BSC Loan as between the parties. As described above, Sections A, 2.0, 3.0, 4.1(a), 8.0, and 9.0 of the Release Agreement support the proposition that the transfer of the Deed in Lieu of Foreclosure satisfied Defendants obligations under the Amended Wong/Day Loan but did not affect the parties' obligations as to the BSC Loan. At the same time, when the Release Agreement was executed in April 2006, Plaintiffs were borrowers of record together with Defendant on the BSC Loan. (*See id.*, Exh. 2 at 44-46). Thus, as of April 2006, the BSC Loan constituted a liability—necessarily originating prior to the effective date of the Release Agreement—for which Plaintiffs already bore legal responsibility to a third party (the Bank of St. Croix).[19]

This undisputed context further supports the conclusion that the carve-out of "except the BSC Loan" in the Release Agreement documents the legal relationship of the parties to the Bank

---

[19] Indeed, Plaintiffs remained borrowers of record as it relates to the Bank of St. Croix even after Defendant assumed sole responsibility, as between the parties, for the BSC Loan, following the exhaustion of the additional $300,000 loan. (*See* Dkt. No. 18, Exh. 3 at 47).

of St. Croix—and therefore to a third party—for the BSC Loan debt when the parties signed the Agreement in April of 2006. Section 5.0 addresses Plaintiffs' obligations to third parties, not their obligations with respect to Defendant. Plaintiffs agreed to "assume and discharge" the BSC Loan as it relates to their responsibility as signatories—together with Defendant—on that loan. Plaintiffs fulfilled this responsibility in April 2013 when they purchased the rights of the BSC Loan, thereby preventing the Bank of St. Croix from foreclosing on the Property. (Dkt. No. 18, Exh. 4 at 1-4).

Thus, Section 5.0 is a provision to ensure that no obligations to third parties relating to the Property—which Defendant may have incurred while developing the Property for sale or otherwise—were transferred from Defendant to Plaintiffs along with the Deed in Lieu of Foreclosure. At the same time, Section 5 acknowledges and confirms that Plaintiffs held an existing obligation to a third party—the Bank of St. Croix—relating to the Property. Accordingly, the context in which the parties contracted supports the Court's conclusion that Section 5.0 of the Release Agreement addresses obligations to third parties and does not affect Defendant's responsibility for the BSC Loan, as between the parties, as set forth in Section 2.1.2 of the Settlement Agreement.

### d.  Conclusion

In view of the foregoing, the Court concludes that the Settlement Agreement unambiguously states that Defendant would assume full responsibility for the BSC Loan upon exhaustion of the additional $300,000 loan from Plaintiffs, and that nothing in the Deed in Lieu of Foreclosure or the Release Agreement alters that responsibility. The Court acknowledges that its conclusion separates title to the Property from responsibility to pay the BSC Loan. However, by entering the various agreements in 2006, Defendant accepted the risk of losing the Property

but retaining sole responsibility for the BSC Loan, in return for: Plaintiffs' agreement to refrain from taking legal action against Defendant; $300,000 in additional funds from Plaintiffs to stave off foreclosure by the Bank of St. Croix; and two years additional time to sell the Property, recoup his investment, and share in any profits. The wisdom of Defendant's choice, or whether this was a good or bad deal for Defendant, is not for the Court to decide—only the parties' intent as expressed in the language of the agreements.

In sum, the Court concludes that Defendant is liable for the BSC Loan, and Plaintiffs, as current owners of the loan, are entitled to judgment as a matter of law for the debt owed on the BSC Loan. Accordingly, the Court will enter summary judgment in Plaintiffs' favor on their claim that Defendant is responsible for payment of the BSC Loan, and deny Defendant's motion for summary judgment.

### B.    Plaintiffs' Motion to Dismiss Defendant's Counterclaim

Plaintiffs argue that Defendant's Counterclaim is barred by the Release Agreement that Defendant signed. (Dkt. No. 18, Exh. 3 at 17-18). Defendant responds that the Release Agreement contained mutual release provisions, and that because Plaintiffs breached their release provision by suing Defendant, Defendant is excused from his obligations under the Release Agreement. (Dkt. No. 27 at 8-9). The Court finds that Defendant's Counterclaim is barred by the Release Agreement and is therefore subject to dismissal, and that Defendant's contrary contentions are without merit.

### 1.    Motion to Dismiss Legal Standard

Pleas for dismissal based on a party's prior release of civil claims are brought as motions under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See Calvitti v. Anthony & Sylvan Pools Corp.*, 351 F. App'x 651, 654 (3d Cir. 2009); *Bd. of Trustees of*

*Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 168-75 (3d Cir. 2002)

(plaintiffs' release of civil claims served as basis for 12(b)(6) motions).[20]

> When presented with a motion to dismiss for failure to state a claim under Rule 12(b)(6):
>
> [D]istrict courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted) (quoting

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)). A court should grant the motion to dismiss if,

accepting as true all of claimant's factual allegations and construing his claim in the light most

favorable to him, it determines that he cannot state a plausible claim for relief. *See Acosta v.*

*Hovensa, LLC*, 2010 WL 695963, at *3 (D.V.I. Feb. 23, 2010) (citing *Capogrosso v. Supreme*

*Court of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009)).

   "On a motion to dismiss, the Court 'may consider documents that are attached to or

submitted with the complaint and any matters incorporated by reference or integral to the

claim.'" *Id.* at *1 n.1 (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir.

2006)). In this regard, the Court may look to a release agreement to determine whether a claim is

barred if the parties do not dispute the agreement's authenticity. *See Delaware Nation v.*

*Pennsylvania*, 446 F.3d 410, 413 n.2 (3d Cir. 2006) (courts may consider contracts and

documents of undisputed authenticity that are attached to a motion to dismiss); *PPG Indust., Inc.*

---

[20] Although Plaintiffs do not cite a Federal Rule of Civil Procedure under which they bring their Motion to Dismiss, the essence of their argument is that Defendant has failed to state a claim upon which relief may be granted because he bargained away his right to pursue his Counterclaim in the Release Agreement. (Dkt. No. 18 at 18). The Court therefore construes Plaintiffs' Motion as a Rule 12(b)(6) motion, as did Defendant in his Opposition. (Dkt. No. 27 at 9).

*v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 525 (W.D. Pa. 2011) (considering parties' release agreement on motion to dismiss counterclaim). A valid release renders a party without a claim upon which relief could be granted, and therefore dismissal of the claim under Rule 12(b)(6) is appropriate. *See Calvitti*, 351 F. App'x at 654; *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x 728, 730-33 (3d Cir. 2005) (affirming dismissal where release, signed by claimant, barred all of his claims).

### 2.    Analysis

To determine the proper interpretation and application of the Release Agreement, the Court looks to the specific language in the Agreement and applies "general principles of contract construction." *See Coventry v. United States Steel Corp.*, 856 F.2d 514, 522 (3d Cir. 1988). As previously noted, the Court must construe a contract in light of its unambiguous language. *See Citibank, N.A.*, 2001 WL 1568553, at *3; *Geraghty v. Insur. Servs. Office, Inc.*, 369 F. App'x 402, 406 (3d Cir. 2010) (granting motion to dismiss claims based on release's "clear and unambiguous language").[21]

Section 3.0 of the Release Agreement states:

> [Defendant] hereby releases, discharges, and agrees to hold harmless [Plaintiffs] and their agents . . . from any and all further demands, claims, suits, action, costs, expenses, obligations, damages, and other liabilities of every nature, known or unknown, present or contingent, arising out of or resulting from the Loan Documents, the administration and collection of the **$842,008.00** loan, and the transactions being consummated pursuant to the provisions of the Settlement Agreement, this Agreement and the Deed in Lieu of Foreclosure.

(Dkt. No. 18, Ehx. 3 at 15-16). The Settlement Agreement defines "Loan Documents" as: "[t]he original Wong/Day Loan Documents, this Settlement Agreement, the Wong/Day Amended Note,

---

[21] Neither party challenges the validity—or authenticity—of the Release Agreement; rather, both parties seek to enforce it, albeit with different interpretations of its application. (*See* Dkt. No. 18 at 17-18 (Plaintiffs); Dkt. No. 20 at 4-5 (Defendant)).

Wong/Day Amended Mortgage, and all the other documents described herein and/or signed in connection herewith." (*Id.* at 8). Thus, pursuant to the plain language of Section 3.0, Defendant has waived any claim against Plaintiffs which arises, *inter alia*, out of the listed documents.

Count I of the Counterclaim seeks reformation of the Settlement Agreement in accordance with Defendant's interpretation of its provisions. (Dkt. No. 3 at ¶¶ 25-38). In the alternative, Defendant seeks nullification of the Deed in Lieu of Foreclosure. (*Id.* at ¶ 38). Because Count I is grounded in the transfer of the Deed in Lieu of Foreclosure and necessitates an interpretation of the Settlement Agreement, it therefore arises out of those documents and "transactions being consummated pursuant" to the documents. *Cf. Black's Law Dictionary* 122 (9th ed. 2009) (to "arise" means "to originate; to stem (from)" or "to result (from)"). Accordingly, Count I is barred by the release in Section 3.0.

Count II of the Counterclaim alleges that Plaintiffs "breached their fiduciary duties" to Defendant as joint venturers "by engaging in predatory lending practices." (Dkt. No. 3 at ¶¶ 39-44). The lending at issue is memorialized in the Settlement Agreement, the Amended Wong/Day Loan note, and the Deed in Lieu of Foreclosure. (S*ee id.* at ¶¶ 18-24, 42). Therefore, Count II arises out of these documents and "transactions being consummated pursuant" to such documents, and is barred by the release in Section 3.0.

Count III of the Counterclaim asserts a claim for the Breach of the Duty of Good Faith and Fair Dealing, and alleges that "[b]y enforcing the Deed in Lieu of Foreclosure, [Plaintiffs] have wholly prevented [Defendant] from recouping his investment[, and Plaintiffs] dealt in bad faith with [Defendant] in creating the Settlement Agreement." (*Id.* at ¶¶ 47-48). Because the Settlement Agreement and the Deed in Lieu of Foreclosure form the basis for Count III, and

Count III therefore arises out of those documents, Count III is also barred by the release in Section 3.0.

Defendant essentially concedes that he waived the claims in his Counterclaim under the Release Agreement, but argues that Plaintiffs sued Defendant in contravention of Section 2.0 of the Release Agreement, and thus his subsequent noncompliance with Section 3.0 is excused. (*See* Dkt. No. 27 at 9-10) (contending that Plaintiffs "failed to perform a material part of the contract by suing [Defendant] . . . and he is entitled to assert his counterclaim despite the reciprocal release" in Plaintiffs' favor). This argument erroneously assumes that Plaintiffs' Complaint constitutes a breach of the Section 2.0 release.

In Section 2.0 of the Release Agreement, Plaintiffs discharged Defendant from all liability "under the Wong/Day Loan Documents," as the term is defined in the Settlement Agreement. (Dkt. No. 18, Exh. 3 at 15). The Court concluded above that the BSC Loan is not subsumed within the term "Wong/Day Loan Documents." *See supra*, Part II.A.2.b. Therefore, Plaintiffs' original Complaint, which was grounded in the BSC Loan, did not breach the release in Section 2.0.

In sum, the Court finds that Defendant's claims "arise out of" the documents and transactions listed in Section 3.0 of the Release Agreement, and were therefore waived under the plain language of the Release Agreement. Because Plaintiffs' Complaint was not filed in contravention of Section 2.0 of the Release Agreement, the premise upon which Defendant relies to justify his assertion of claims against Plaintiffs is fatally flawed. Accordingly, the Court will

dismiss Defendant's Counterclaim pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See Cuchara*, 129 F. App'x at 734.[22]

### C.  Plaintiffs' Motion for Summary Judgment on Plaintiffs' Claim Regarding the Amended Wong/Day Loan

Plaintiffs have also moved for summary judgment on their claim asserted in the First Amended Complaint for the outstanding Amended Wong/Day Note. (Dkt. No. 39). Plaintiffs argue that because Defendant violated the terms of the Release Agreement by filing a Counterclaim, they are entitled to collect on the full $842,008 due under the Amended Wong/Day Loan. (Dkt. No. 40 at 1).[23] In response, Defendant repeats his argument that his breach of the Release Agreement is excused because Plaintiffs first breached the Release Agreement by filing their Complaint. (Dkt. No. 64 at 1).

Defendant's argument is predicated on a finding that Plaintiffs' Complaint constitutes a breach of Section 2.0 of the Release Agreement. As previously discussed, the Court concludes

---

[22] Together with their motion to dismiss Defendant's Counterclaim, Plaintiffs also moved to strike Defendant's jury demand and to expunge the *lis pendens*. (Dkt. No. 17). Dismissal of the Counterclaim renders Defendant's jury demand on his claims therein moot. The *lis pendens* that Defendant filed with the Recorder of Deeds is based on Defendant's Counterclaim. (*See* Dkt. No. 4). Because the Court will dismiss the Counterclaim, the Court will order that the *lis pendens* must be released as to the Property. *See Wheatley v. Magras*, 2012 WL 203480, at *6 (V.I. Super. Ct. Jan. 11, 2012) (granting summary judgment on breach of contract claim, dismissing plaintiffs' claims, and ordering that *lis pendens* be released within twenty-one days); *see also Gage v. Wells Fargo Bank, N.A.*, 555 F. App'x 148, 152 (3d Cir. 2014) (affirming district court's discharge of *lis pendens* where court dismissed claims because the "purpose of *lis pendens* is to preserve property which is subject matter of the lawsuit so that judicial relief can be granted if plaintiff prevails"). The Court will therefore deny as moot Plaintiffs' Motion to Strike Defendant's Jury Demand and their Motion to Expunge Defendant's Notice of *Lis Pendens* (Dkt. No. 17).

[23] In their Motion for Summary Judgment, Plaintiffs again argue that Defendant's Counterclaim should be dismissed, based on: (1) the covenant not to sue in Section 4.0 of the Release Agreement, and (2) the release of Plaintiffs from all future claims by Defendant in Section 3.0 of the Release Agreement. (Dkt. No. 40 at 4-7). As discussed above, the Court has determined that Defendant's Counterclaim must be dismissed for failure to state a claim based on Section 3.0 of the Release Agreement.

that the term "Wong/Day Loan Documents" does not encompass the BSC Loan so as to render Plaintiffs' original claim on the BSC Loan violative of Plaintiffs' release of Defendant in Section 2.0. Therefore, Defendant's obligations in the Release Agreement remain binding.

In Section 2.0 of the Release Agreement, Plaintiffs released Defendant of "all liability and other obligations under the Wong/Day Loan Documents, *subject to the provisions of this Agreement*." (Dkt. No. 18, Exh. 3 at 15) (emphasis added). In Section 4.0 of the Release Agreement, the parties agreed that the Section 2.0 release would be voided and Defendant would be obligated to repay Plaintiffs "the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement" if one of several situations arose. (*Id.* at 16). Pursuant to Section 4.1(a), one of those situations was if Defendant violated his agreement to forebear from acting as an "adverse party" in "any suit or other proceedings against [Plaintiffs] . . . relating to (i) the validity of the Deed in Lieu of Foreclosure, (ii) the Wong/Day Loan Documents, [or] (iii) the BSC Loan." (*Id.* at 16). Thus, Plaintiffs' release of Defendant as to liability on the Amended Wong/Day Loan was conditioned on Defendant's forbearance from filing suit.

Here, Defendant has acted as an adverse party to Plaintiffs within the meaning of Section 4.1(a) by filing his Counterclaim. Count I of Defendant's Counterclaim seeks nullification of the Deed in Lieu of Foreclosure, and therefore falls under situation (i) in Section 4.1(a). Count II complains of alleged "predatory lending practices," which implicates Section 4.1(a)(ii). Count III claims Breach of the Duty of Good Faith and Fair Dealing, and implicates Section 4.1(a)(i). Therefore, the Court finds that Defendant has breached his agreement not to sue in Section 4.0 and, thus, Plaintiffs are entitled to the relief set forth in that Section, including payment by Defendant of the Amended Wong/Day Note.[24] Accordingly, the Court will grant Plaintiffs'

---

[24] Section 4.0 provides, in part, that "the Borrower shall be obligated to repay Lender the

Motion for Summary Judgment on their claim that they are entitled to relief under Section 4.0 of the Release Agreement. (*Id.* at 16).[25]

### III.   CONCLUSION

For the foregoing reasons, the Court will: (1) grant Plaintiffs' two Motions for Summary Judgment as they pertain to their entitlement to damages (Dkt. Nos. 39, 44); (2) deny Defendant's "Motion for Summary Judgment" (Dkt. No. 19); (3) grant Plaintiffs' Motion to Dismiss Defendant's Counterclaim (Dkt. No. 17); (4) order the release of the *Lis Pendens*; (5) deny as moot Plaintiffs' Motion to Strike Defendant/Counterclaimant's Jury Demand and to Expunge his *Lis Pendens* (Dkt. No. 17); (6) grant, *nunc pro tunc*, Plaintiffs' "Consent Motion for Extension of Time to Respond to Robert W. White's Motion for Summary Judgment" (Dkt. No. 29); and (7) deny as moot Plaintiffs' "Motion to Reconsider Court Order . . . Granting Frank White's Motion to Stay Briefing for Opposition to Summary Judgment" (Dkt. No. 43).

An appropriate Order accompanies this Opinion.

Date:   September 30, 2015

_____/s/_____
WILMA A. LEWIS
Chief Judge

---

indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement . . . ." (Dkt. No. 18, Exh. 3 at 16). The Settlement Agreement expressly incorporates the Amended Wong/Day Loan Note. (*See id.* at 15).

[25] In addition to the debt and interest due under the Amended Wong/Day Loan, Plaintiffs make a bare-bones request for costs and attorney's fees incurred in defending against the Counterclaim. In their initial Memorandum of Law in Support of Day and Wong's Motion for Summary Judgment Concerning White's Counterclaim, the Plaintiffs devote a total of only two sentences to their argument that they are entitled to attorney's fees and costs. (Dkt. No. 40 at 9). In the Plaintiffs' subsequent Reply to Opposition to Motion for Summary Judgment Concerning White's Counterclaim, they make no mention of the request or any argument in support thereof. As relief Plaintiffs seek (1) dismissal of Defendant's Counterclaim, (2) payment of the default sum of the Wong/Day Note, and (3) such other relief that the Court deems proper. (Dkt. No. 65 at 4). The Court will not consider the issue of Plaintiffs' entitlement to attorney's fees and costs in the absence of a full articulation by Plaintiffs of the factual and legal bases therefor, followed by an opportunity to respond thereto by Defendant.