## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **FRANK B. DAY and ARTHUR WONG,** | ) | |
| | ) | |
| **Plaintiffs/Counterclaim Defendants,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 2013-0044** |
| | ) | |
| **ROBERT WHITE a/k/a ROBERT W. WHITE,** | ) | |
| | ) | |
| **Defendant/Counterclaimant.** | ) | |
| | ) | |

**Attorneys:**
**Kevin A. Rames, Esq.,**
St. Croix, U.S.V.I.
   *For Plaintiffs/Counterclaim Defendants*

**Andrew C. Simpson, Esq.,**
**Emily A. Shoup, Esq.,**
St. Croix, U.S.V.I.
   *For Defendant/Counterclaimant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Plaintiffs' "Notice of Filing of Calculation of Amount Due on the Bank of St. Croix Promissory Note and Wong/Day Promissory Note" (Dkt. No. 71); Plaintiffs' "Motion for an Award of Attorneys' Fees and Costs" (Dkt. No. 70); "Defendant's Opposition to Plaintiffs' Statement on Damages" (Dkt. No. 78); Defendant's "Opposition to Motion for Award of Attorney's Fees" (Dkt. No. 79); Plaintiffs' "Reply to Opposition to Plaintiffs' Statement on Damages" (Dkt. No. 80); Plaintiffs' "Reply to Opposition to Motion for Attorney's Fees" (Dkt. No. 81); Plaintiffs' "Supplement to Reply to Opposition to Plaintiffs' Statement on Damages" (Dkt. No. 82); Plaintiffs' "Calculation of Amended Promissory Note to November 5, 2012 and to Date" (Dkt. No. 88); Defendant's "Opposition to Plaintiffs'

Renewed Calculation of Amounts Due Under the Amended Promissory Note" (Dkt. No. 89); and Plaintiffs' "Reply to Opposition to Renewed Calculation of Amended Promissory Note to November 5, 2012 and to Date" (Dkt. No. 90). For the reasons discussed below, the Court will award Plaintiffs $3,908,927.07 in damages and $115,623 in attorney's fees and costs.

## I.      BACKGROUND AND PROCEDURAL HISTORY

This case centers on various contracts between Defendant Robert White and Plaintiffs Frank B. Day and Arthur Wong regarding Plot 132 of Estate Green Cay in St. Croix (the "Property"). In September 2000, Defendant acquired title to the Property and later obtained financing from various sources to design and build a luxury home on the Property for eventual sale. (Dkt. No. 53 at 3). On September 15, 2005, Plaintiffs and Defendant jointly borrowed $1,650,000 from the Bank of St. Croix (the "BSC Loan"), which was secured by a First Priority Mortgage on the Property. (Dkt. No. 18-2 at 44-46; Dkt. No. 53 at 3-4; Dkt. Nos. 21 and 33 at ¶¶ 8-9).[1] In addition to co-signing the BSC Loan with Defendant, Plaintiffs extended a credit facility to Defendant in the amount of $500,000 (the "Wong/Day Loan"), secured by a Second Priority Mortgage on the Property. (Dkt. No. 18-2 at 48-65, Dkt. No. 18-3 at 1-4).[2]

In April 2006, Defendant was in arrears on both the BSC Loan and the Wong/Day Loan, and had failed to obtain property and liability insurance for the Property as required under the BSC Loan. (Dkt. No. 18-3 at 6). The parties negotiated a settlement in which Plaintiffs loaned an additional $300,000 to Defendant and agreed to refrain from taking immediate legal action against

---

[1] As discussed in greater detail in the Court's Memorandum Opinion entered on September 30, 2015, the BSC Loan was used, *inter alia*, to pay off previous indebtedness that Defendant had incurred to develop the property. (Dkt. No. 67 at 3).

[2] The BSC Loan and Wong/Day Loan carry interest rates of 7.0% and 15.0% per annum, respectively. (Dkt. No. 18-2 at 44; Dkt. No. 18-3 at 1).

him. (*See id.* at 6-7). The additional $300,000 loan was consolidated with the original Wong/Day Loan and its accrued interest for a total of $842,008 (the "Amended Wong/Day Loan"). (*Id.* at 7).[3] The parties memorialized the terms of the settlement in: (1) a Settlement Agreement (*id.* at 6-14); (2) a Release Agreement (*id.* at 15-19); (3) a Security Agreement (*id.* at 20-32); and (4) a Deed in Lieu of Foreclosure (*id.* at 33-36).

The Settlement Agreement provides that "when the additional $300,000 loan proceeds have been exhausted, [Defendant] shall be solely responsible for paying any indebtedness owed to Bank of St. Croix." (*Id.* at 7-8). In addition, the Settlement Agreement contemplates that the Property would either be sold or remain unsold by April 1, 2008, the maturity date of the Amended Wong/Day Loan. (*See id.* at 8-9). However, if Defendant defaulted on payments due under either the Amended Wong/Day Loan or the BSC Loan prior to April 1, 2008, the Settlement Agreement directs that the Deed in Lieu of Foreclosure would be delivered to Plaintiffs, Defendant would lose all interest in the Property, and the Release Agreement would become effective. (*Id.* at 8, 11, 15; Dkt. No. 53 at 5).

Pursuant to the Release Agreement, if Defendant defaulted on his obligations in the Settlement Agreement and the Deed in Lieu of Foreclosure was delivered to Plaintiffs, Defendant would be released "from any and all liability and other obligations under the Wong/Day Loan Documents, subject to the provisions of [the Release] Agreement." (Dkt. No. 18-3 at 15).[4] However, upon the occurrence of various events, Section 4.0 of the Release Agreement provides

_____

[3] The Amended Wong/Day Loan was secured by an amended promissory note and constituted the seventh credit facility extended to Defendant. (*See* Dkt. No. 18-3 at 38-41).

[4] The Settlement Agreement defines "Wong/Day Loan Documents" to encompass "the Wong/Day Note, Wong/Day Mortgage and other loan documents evidencing, securing, or otherwise signed in connection with the Wong/Day Note." (Dkt. No. 18-3 at 6).

that the release of Defendant from his obligation under the Wong/Day Loan Documents would be void, and Defendant would be required to repay certain monies. (*Id.* at 16).

The additional $300,000 loan proceeds were disbursed, but Defendant failed to sell the Property by April 1, 2008, or otherwise pay off the BSC Loan or the Amended Wong/Day Loan. (Dkt. No. 67 at 7). In November 2012, Plaintiffs sent Certificates of Default to the escrow agent, which state that Defendant was "in continuing default of his payment obligations under Section 2 of the Settlement Agreement." (Dkt. No. 18-3 at 43-45). In accordance with the Settlement Agreement, the escrow agent delivered to Plaintiffs the Deed in Lieu of Foreclosure (and with it the ownership of the Property), and the Release Agreement became effective. (Dkt. No. 67 at 7).

In early April 2013, Plaintiffs paid the Bank of St. Croix $1,465,132.12, and the Bank of St. Croix "assigned" the BSC Loan to them. (Dkt. No. 18-3 at 47-49). Plaintiffs then demanded that Defendant pay "all amounts due and owing under the [BSC Loan], given [Defendant's] commitment in the Settlement Agreement." (Dkt. No. 18-4 at 6-8).[5] When Defendant did not pay, Plaintiffs filed their Complaint in the instant matter for the debt and interest outstanding on the BSC Loan on April 30, 2013 (Dkt. No. 1), and later amended their Complaint to include the "full outstanding amount of the [Amended Wong/Day Loan]" (Dkt. No. 36 at 3).[6]

On September 30, 2015, this Court entered an Order and Memorandum Opinion ruling in Plaintiffs' favor. (Dkt. Nos. 66-67). As to Defendant's liability for the BSC Loan, the Court concluded that "under the plain language of Section 2.1.2 of the Settlement Agreement, at some

---

[5] The commitment referred to the Settlement Agreement's provision—noted above—that "when the additional $300,000 loan proceeds have been exhausted, [Defendant] shall be solely responsible for paying any indebtedness owed to Bank of St. Croix." (Dkt. No. 18-3 at 7-8).

[6] This additional claim resulted from Defendant's breach of the Release Agreement when he filed his Counterclaim against Plaintiffs. (*See* Dkt. No. 67 at 30).

point after April 2006 when the $300,00 was fully disbursed, Defendant became solely responsible for the debt outstanding on the BSC Loan" and that "[t]here is no provision in the Settlement Agreement by which the transfer of the Deed in Lieu of Foreclosure absolved Defendant of his sole responsibility for the BSC Loan upon exhaustion of the $300,000 loan." (Dkt. No. 67 at 15-16). Additionally, the Court went on to hold that "the Release Agreement did not relieve Defendant of his obligation for the BSC Loan or transfer Defendant's responsibility for the BSC Loan to Plaintiffs." (*Id.* at 17). The Court reasoned that "Plaintiffs agreed to 'assume and discharge' the BSC Loan as it relates to their responsibility as signatories—together with Defendant—on that loan." (*Id.* at 23).

As to Defendant's liability under the Amended Wong/Day Loan, the Court held that Defendant violated the terms of the Release Agreement and triggered Section 4.0 by filing his Counterclaim in the current action. (*Id.* at 30). Specifically, the Court held that "Plaintiffs are entitled to the relief set forth in [Section 4.0 of the Release Agreement], including payment by Defendant of the Amended Wong/Day Note." (*Id.*).

In its Order and Memorandum Opinion, the Court expressly withheld ruling on the amount of damages, noting that "[t]he relief provided does not include a determination as to the specific amount of damages to be awarded. Such amount must be established with specificity by Plaintiffs in further proceedings, with the opportunity for Defendant to respond." (*Id.* at 2). Concurrently with the Order, the Court scheduled a hearing to discuss further proceedings. (Dkt. No. 66 at 3). Prior to the hearing, Plaintiffs filed both a "Motion for an Award of Attorneys' Fees and Costs" in which they request a total of $165,810.61 in attorney's fees and costs (Dkt. No. 70), and a "Notice of Filing of Calculation of Amount Due on the Bank of St. Croix Promissory Note and Wong/Day Promissory Note" (Dkt. No. 71). In a subsequent Order, the Court set a briefing schedule for both

Plaintiffs' Motion for an Award of Attorneys' Fees and Costs and their Notice of Filing of Calculation of Amount Due. (Dkt. No. 72). After both parties submitted additional briefs, the Court held a hearing, during which the parties presented arguments regarding both issues. After the hearing, the Court ordered, and received, additional briefing regarding the damages associated with the Amended Wong/Day Loan. (Dkt. No. 86).

## II.    APPLICABLE LEGAL PRINCIPLES

Plaintiffs' entitlement to damages is grounded primarily in the various contracts entered into by the parties.[7] In examining a contract, "the Court must first look to the intent of the parties as 'objectively manifested by them and make a preliminary inquiry as to whether the contract is ambiguous.'" *Booth v. Bowen*, 2007 U.S. Dist. LEXIS 78721, at *4 (D.V.I. Oct. 18, 2007) (quoting *Sunshine Shopping Ctr., Inc. v. Kmart Corp.*, 85 F. Supp. 2d 537, 540 (D.V.I. 2000)). "Before making a finding concerning the existence or absence of an ambiguity, [courts] consider the contract language and the extrinsic evidence offered in support of each interpretation." *Freund v. Liburd*, 2016 V.I. LEXIS 87, *12-14 (V.I. Super. Ct. July 7, 2016) (quoting *White v. Spenceley Realty, LLC*, 53 V.I. 666, 678-79 (V.I. 2011)) (quotations and ellipsis omitted).

When determining a contractual provision's meaning, courts must "read the contract as a whole, putting its terms in context." *Lovern v. Jackson*, 2015 WL 494069, at *15 (D.V.I. Feb. 3, 2015); *see also Hamed v. Yusuf*, 2014 WL 3697817, at *4 (V.I. Super. July 22, 2014) (noting that a corporation's by-laws, like contracts and statutes, "are construed according to their plain meaning within the context of the document as a whole" (quoting *Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 2012 WL 2924122, at *4 (V.I. July 13, 2012))) (quotations omitted). "A writing is interpreted

---

[7] As discussed below, in addition to their contractual rights, Plaintiffs are also entitled to certain attorney's fees and costs pursuant to 5 V.I.C. § 541.

as a whole, and all writings that are part of the same transaction are interpreted together." *Sunshine Shopping Ctr., Inc.*, 85 F. Supp. 2d at 540 (quotations and citation omitted); *see also Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986) (noting that "where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole").

In a breach of contract action, the burden is on the plaintiff to establish all of the elements for a breach of contract, including damages. *See Rainey v. Hermon*, 2011 WL 4738534, at *3 (V.I. Oct. 6, 2011) (noting that a plaintiff in a breach of contract action "must establish . . . damages" (quoting *Arlington Funding Servs., Inc. v. Geigel*, 51 V.I. 118, 134–35 (V.I .2009))) (quotations omitted); *see also George v. V.I. Lottery Comm'n*, 54 V.I. 533, 541 (2010) ("it is well established that the burden is on the plaintiff to establish proximate cause between breach and damage and if the loss caused by a breach cannot be isolated from that attributable to other factors, no damages may be awarded" (quoting *S.J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 527 (3d Cir. 1978))) (omitting brackets and quotations). Additionally, "[t]he measure of damages for breach of contract is normally that amount which would put the plaintiff in the same position in which he would have been had the contract been performed." *Caribe Contr. Co. v. Edwards*, 18 V.I. 194, 199 (V.I. Terr. Ct. 1982); *see also Atacs Corp. v. Trans World Communs.*, 155 F.3d 659, 669 (3d Cir. 1998) ("The preferred basis of contract damages seeks to protect an injured party's 'expectation interest' -- that is, the interest in having the benefit of the bargain -- and accordingly awards damages designed to place the aggrieved in as good a position as would have occurred had the contract been performed.").

### III. DISCUSSION

#### A. Damages for BSC Loan

As to the damages relating to the BSC Loan, Plaintiffs assert that they are entitled to the principal and interest owing under the BSC Loan as well as the interest that continues to accrue until the BSC Loan is paid in full. (*See* Dkt. No. 71-1 at 2). In contrast, Defendant argues that when Plaintiffs purchased the BSC Loan, they discharged the debt thereby absolving Defendant of any liability under the Loan. (Dkt. No. 78 at 2-3). As explained below, the Court agrees with Defendant that the BSC Loan was discharged when Plaintiffs purchased it from the Bank of St. Croix, but nonetheless finds that Plaintiffs are entitled to the damages they incurred when they purchased the BSC Loan.

#### 1. Plaintiffs Discharged the BSC Loan

Plaintiffs assert that when they paid the Bank of St. Croix the amount due under the BSC Loan, the BSC Loan was "assigned" to them. Thus, Plaintiffs urge, they have stepped into the shoes of the Bank of St. Croix and are now entitled to the unpaid principal plus the interest and other fees due under the BSC Loan. The Court disagrees because Plaintiffs' position contravenes the principle that "[o]nly when [a] payment is made by one who is not already obligated will there be an assignment rather than a satisfaction of the debt." *Springel v. Prosser*, 2010 Bankr. LEXIS 1141, at *29 (Bankr. D.V.I. Apr. 27, 2010); *see also Robbins Int'l, Inc. v. Robbins MBW Corp.*, 2002 U.S. Dist. LEXIS 3946, at *32 (S.D.N.Y. Mar. 7, 2002) ("It is well settled that one who makes a payment that is the primary obligation of the payor, as distinguished from a payment of the debt of another, is not entitled to subrogation.").

In *Springel v. Prosser*, a dispute arose regarding whether Prosser had a claim against the bankruptcy estate of New ICC. 2010 Bankr. LEXIS 1141, at *2-3. Prosser and New ICC were

originally co-lessees of a vehicle lease. *Id.* at *2. The lessor of the vehicle lease was Huntington National Bank ("HNB"), who had a claim against New ICC's bankruptcy estate for $1,678.50 in connection with the lease. *Id.* at *2-3, 29.[8] Prosser argued that he acquired HNB's claim when he paid HNB $1,678.50 in exchange for HNB assigning him all of its rights, title, and interest in its claim. *Id.* at *2-3. The court in *Springel* disagreed, holding that "as a co-obligor under the terms of the Lease, Prosser has extinguished the claim against New ICC by his payment of $1,678.50 in consideration for the alleged assignment of the claim." *Id.* at *29. In reaching this holding, the *Springel* court cited with approval case law involving mortgages, noting the following:

> Whether a given transaction shall be held in legal effect to operate as a payment and a discharge, which extinguishes the mortgage, or as an assignment which preserves and keeps it on foot, does not so much depend upon the form of the word used, as upon the relation subsisting between the parties advancing the money and the party executing the transfer and release, and their relative duties. If the money advanced is by one whose duty it is by contract or otherwise, to pay and cancel the mortgage, it shall be held to be a release and not an assignment . . . .

*Id.* at *30 (quoting *Walker v. Stone*, 20 Md. 195, 202 (1863)). The *Springel* court also noted that the amount of consideration Prosser paid for the alleged assignment of HNB's claims "was the same amount, to the penny" that Prosser and New ICC, as co-obligors, owed under the vehicle lease. *Id.* at *32-33. The court concluded that "because Prosser is primarily liable and obligated under the Lease to remit payment to the Lessor, the $1,678.50 paid by Prosser to purchase the assignment also constitutes satisfaction of the debt and extinguishes the claim." *Id.*

The Court finds the reasoning in *Springel* to be instructive. As in *Springel*, Plaintiffs and Defendant were co-obligors under the terms of the BSC Loan, and each was liable for the full

---

[8] The court in *Springel* assumed for the purposes of this part of its analysis that HNB was the proper claim holder and that the claim of $1,678.50 was valid. 2010 Bankr. LEXIS 1141, at *28-29.

amount due and owing under the Loan. (Dkt. No. 71-1 at 5 ("If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed.")). Accordingly, as to the Bank of St. Croix, Plaintiffs and Defendant were on equal footing as co-debtors.[9] Moreover, like the "consideration" Prosser paid for HNB's claim in *Springel*, the "purchase price" Plaintiffs paid the Bank of St. Croix for the BSC Loan was $1,465,132.12, which was the exact amount of indebtedness owed under the Loan at the time of the purported assignment. (Dkt. No. 71-1 at 8). Thus, when Plaintiffs paid the Bank of St. Croix $1,465,132.12—the exact amount they owed under the BSC Loan— they satisfied the debt and extinguished the BSC Loan both as to themselves and to their co-obligor, Defendant.

Plaintiffs argue that this rule of law (and the cases Defendant cites in his Opposition in support of the same) is inapplicable to the current situation because "[t]he Note is not a judgment" but is a contract between the parties and the Bank of St. Croix that is freely assignable. (Dkt. No. 80 at 3). In support of their position, Plaintiffs point to Section 20 of the Mortgage, which states that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower." (*Id.* (quoting Dkt. No. 18-2 at 39) (quotations omitted)). Plaintiffs also assert that "[Defendant's] citation to 11A V.I.C. § 3-601, § 3-602(a) and

---

[9] Plaintiffs argue that they were not co-obligors with Defendant by virtue of the parties' Settlement Agreement and Defendant's contractual obligation as between the parties to assume the BSC Loan: "After [Defendant's] obligation to be solely responsible for payment of the [BSC Loan] was triggered by the disbursement to him of $300,000.00 in additional cash consideration, the parties were no longer similarly situated as to the [BSC Loan]." (Dkt. No. 80 at 3). The Court disagrees. The applicable inquiry for determining the effect of Plaintiffs' attempted purchase of the BSC Loan is the legal relationship of the parties and the Bank of St. Croix as relates to the BSC Loan. Under the BSC Loan, Plaintiffs and Defendant were co-obligors who were each liable for the entire indebtedness of the BSC Loan. (Dkt. No. 67 at 22-23). The parties' private agreement has no bearing in this part of the analysis.

§ 3-[604](a) are inapposite because the Note was assigned for consideration; it was not paid and discharged." (*Id.* at 4). The Court is not persuaded by Plaintiffs' arguments.

As to Plaintiffs' argument that the BSC Loan was not discharged because it was a freely assignable promissory note and not a judgment, the Court notes that Plaintiffs fail to put forth any persuasive authority for their position. While the cases Defendant cites in his Opposition on this point (*Phelps v. Scott*, 30 S.W.2d 71, 75 (Mo. 1930); *TacCo Falcon Point, Inc. v. Atl. Ltd. P'ship XII*, 937 N.E.2d 1212, 1221 (Ind. Ct. App. 2010)) admittedly involve the discharge of judgments involving co-debtors as opposed to promissory notes, Plaintiffs fail to cite any case that supports their position that the principles advanced in these cases apply only to judgments and not promissory notes. In contrast to Plaintiffs' position, the Court notes that there is, in fact, support for Defendant's position that an attempted assignment of a promissory note has the effect of discharging the note when consideration for the attempted assignment is paid by an obligor or co-obligor. *See*, *e.g.*, *Roark v. Hicks*, 362 S.E.2d 711, 715 (Va. 1987) ("[W]hen Hicks, who as a co-maker had no right of action or recourse on the note, reacquired it in his own right by assignment from the bank, all other parties to the note were discharged by operation of law. The chancellor correctly dismissed Hicks' claim on the note."); *Bunker v. Llewellyn*, 18 S.E.2d 717, 718 (N.C. 1942) (holding that where two co-makers of a note purchased it from the mortgagee under the "express agreement" that their purchase of the note "was not to constitute a payment and satisfaction of it, but that they were to have the rights of the bank to collect from the other signers and makers," the purchase of the note nonetheless extinguished it leaving the co-makers with rights of equitable contribution but not subrogation) (internal quotations omitted); *Benmaor v. Goldberg*, 1999 WL 706627, at *2 (Mass. Super. Aug. 23, 1999) (holding that a co-obligor who paid off a promissory note and received an assignment of the note could not then foreclose against his co-

obligor, reasoning that "[w]hen one co-maker of a note pays the full amount due on the note, he discharges not only his own liability on the note but that of his other co-makers as well" and that his status of assignee of the mortgage and note "does not change the fact that the instruments 'assigned' to him are no longer enforceable due to their discharge"); *cf. Springel*, 2010 Bankr. LEXIS 1141, at *29 (holding that an attempted purchase of a claim for a debt by one who is co-obligated to pay the debt discharged the debt and noting that "case law regarding the purchase of a mortgage by a mortgagee is analogous to the situation at bench").

In this regard, the Court finds the case of *Banknorth, N.A. v. Alticomm, Inc.*, 2006 WL 3759573, at *2 (Mass. Super. Oct. 23, 2006) to be particularly instructive. In *Banknorth*, after the debtor on a promissory note defaulted, one of the co-guarantors paid off the note in full in return for an assignment from the bank of the promissory note and the personal guarantees of the remaining co-guarantors. *Id.* at *1. The court found that the co-guarantor's payment to the bank extinguished the debt, observing the following:

> Massachusetts law provides that liability on a negotiable instrument is terminated "by an act ... which would discharge an obligation to pay money under a simple contract." [Mass. Gen. Laws ch.] 106, § 3–601(a) (2004). Therefore, once the debt was extinguished, [the remaining] co-guarantors' liability was extinguished, and [the bank] could not transfer to [the co-guarantor] any interest in enforcing their promises.

*Id.* at *2.

The Court finds that the *Banknorth* decision is also instructive as to Plaintiffs' argument that 11A V.I.C. § 3-601 is inapplicable to the current situation simply because the BSC Loan was purportedly assigned. The statutory provision the court in *Banknorth* cites (Mass. Gen. Laws ch. 106, § 3–601(a)) is similar to the Virgin Islands statute that Defendant quotes in his Opposition: "The obligation of a party to pay the instrument is discharged as stated in this Article or by an act or agreement with the party which would discharge an obligation to pay money under a simple

contract." 11A V.I.C. § 3-601; (*see also* Dkt. No. 78 at 3). Except for Plaintiffs' unsupported and unpersuasive assertion that 11A V.I.C. § 3-601 does not apply "because the Note was assigned for consideration," Plaintiffs fail to put forth any other argument or authority as to why Defendant's interpretation of 11A V.I.C. § 3-601—which follows the interpretation of the court in *Banknorth*— is incorrect.

As to Plaintiffs' argument regarding the freely assignable nature of the BSC Loan, the Court finds that this argument ignores the fact that Plaintiffs discharged the Loan when they—as co-obligors under the Loan—paid the entire indebtedness to the Bank of St. Croix. As the court observed in *Springel*, "[w]hether a given transaction shall be held in legal effect to operate as a payment and a discharge, which extinguishes the mortgage, or as an assignment which preserves and keeps it on foot, does not so much depend upon the form of the word used, as upon the relation subsisting between the parties." 2010 Bankr. LEXIS 1141, at *30 (quoting *Walker*, 20 Md. at 202) (quotations omitted); *see also Banknorth*, 2006 WL 3759573, at *2 (noting that "[h]owever the parties may have chosen to label the nature of [the co-guarantor's] interest" an extinguished debt cannot be enforced or assigned). Plaintiffs' payment of the entire indebtedness to the Bank of St. Croix extinguished the BSC Loan and, therefore, the Bank of St. Croix had no rights to assign to Plaintiffs. *See Benmaor*, 1999 WL 706627, at *2 ("[A]s the 'assignee' of [the mortgagee], [the co-maker] does not acquire any rights beyond those of [the mortgagee] itself. Once the note was paid in full to [the mortgagee], the note and mortgages were automatically discharged. 'Assigning' them to [the co-maker] did not create any new liability under them."). The free assignability of the loan does not, therefore, apply to a co-borrower who pays off the indebtedness.[10]

---

[10] The fact that the assignability provision applies instead to third parties is reinforced by the explicit terms of the provision which states that the Note can be sold "without prior notice to Borrower." (Dkt. No. 18-2 at 39).

Finally, Plaintiffs also argue that the BSC Loan is governed by Article 9 of the Virgin Islands' Uniform Commercial Code, and that 11A V.I.C. § 9-406 "deem[s] any contractual or legal restrictions on assignability ineffective." (Dkt. No. 80 at 5). Plaintiffs conclude, therefore, that any rule of law that would render the assignment of the BSC Loan ineffective or have the effect of discharging the debt "is deemed to be 'ineffective' under Virgin Islands law." (*Id.* at 6). Plaintiffs' argument in this regard is unavailing.[11]

First, the Court finds that Plaintiffs' citation to 11A V.I.C. § 9-406 is misplaced as § 9-406 does not apply to promissory notes. In relevant part, § 9-406(d) provides as follows:

> Except as otherwise provided in subsection (e) and Sections 2A-303 and 9-407, and subject to subsection (h), a term in an agreement between an account debtor and an assignor or in a promissory note is ineffective to the extent that it:
>
> . . . .
>
> (2) provides that the assignment or transfer or the creation, attachment, perfection, or enforcement of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the account, chattel paper, payment intangible, or promissory note.

11A V.I.C. § 9-406. However, Plaintiffs fail to acknowledge § 9-406(e), which provides that "Subsection (d) does not apply to the sale of a payment intangible or promissory note." § 9-406(e). Thus, under Plaintiffs' argument that they purchased the BSC Loan from the Bank of St. Croix, § 9-406(d) is inapplicable because it "does not apply to the sale of a . . . promissory note."

Plaintiffs' citation to 11A V.I.C. § 9-406(f) is similarly flawed. In relevant part, § 9-406(f) provides as follows:

> Except as otherwise provided in Sections 2A-303 and 9-407 and subject to subsections (h) and (i), a rule of law, statute, or regulation that prohibits, restricts,

---

[11] In Plaintiffs' Reply brief, they quote from 11A V.I.C. § 9-406(d) and 9-406(f). (Dkt. No. 80 at 5-6). In a footnote, Plaintiffs also cite 11A V.I.C. § 9-408 and the associated Uniform Law Comment. (*Id.* at 6 n.1). Reading Plaintiffs' Reply brief liberally, the Court examines whether either § 9-406 or § 9-408 supports Plaintiffs' argument.

or requires the consent of a government, governmental body or official, or account debtor to the assignment or transfer of, or creation of a security interest in, an account or chattel paper is ineffective to the extent that the rule of law, statute, or regulation:

. . . .

(2) provides that the assignment or transfer or the creation, attachment, perfection, or enforcement of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the account or chattel paper.

§ 9-406(f). By its terms, § 9-406(f) applies only to an "account or chattel paper," which are distinct from a "promissory note." *See* 11A V.I.C. § 902 (separately defining account, chattel paper, and promissory notes).[12] Defendant makes no assertion that the BSC Loan involves an "account" or "chattel paper" and, in fact, correctly refers to the BSC Loan as a "promissory note." (*See* Dkt. No. 80 at 5 (arguing that Defendant's reference to the Restatement is inapplicable because "there is a controlling Virgin Islands statute that allows for free assignability of promissory notes"). Thus, Plaintiffs' bald reliance on § 9-406 fails to support their position.[13]

Plaintiffs reference to 11A V.I.C. § 9-408 is similarly misplaced. Unlike § 9-406, § 9-408 does apply to promissory notes. In relevant part, § 9-408(c) provides:

A rule of law, statute, or regulation that prohibits, restricts, or requires the consent of a government, governmental body or official, person obligated on a promissory note, or account debtor to the assignment or transfer of, or creation of a security interest in, a promissory note, health-care-insurance receivable, or general

---

[12] The Court notes that the definition of "account" expressly "does not include rights to payment evidenced by . . . an instrument." Because "promissory note" is defined in relevant part as "an instrument that evidences a promise to pay a monetary obligation," an "account" cannot be a "promissory note." 11A V.I.C. § 9-102(a)(2), 9-102(a)(65). It is similarly clear that the BSC Loan is not chattel paper because chattel paper involves a "monetary obligation and a security interest in specific goods," as opposed to the present situation in which the security interest involves real property. *Id.* § 9-102(a)(11).

[13] Here too, the Court notes that Plaintiffs have failed to cite any case law supporting their interpretation of Article 9 of the Virgin Islands Uniform Commercial Code.

intangible, including a contract, permit, license, or franchise between an account debtor and a debtor, is ineffective to the extent that the rule of law, statute, or regulation:

(1) would impair the creation, attachment, or perfection of a security interest; or

(2) provides that the assignment or transfer or the creation, attachment, or perfection of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the promissory note, health-care-insurance receivable, or general intangible.

§ 9-408(c). However, an examination of this section and its associated Uniform Law Comments shows that, consistent with the title of Part 4 of Article 9—of which § 9-408 is a part—this section applies to "Rights of Third Parties." Specifically, § 9-408 addresses situations in which a *third party* obtains a security interest in a payment intangible or promissory note (*e.g.*, if a mortgagee, in order to obtain financing from a third party, gives the third party a security interest in its rights under a promissory note). For instance, Example 1 in the Uniform Law Comments to § 9-408 addresses a situation in which a license agreement regarding computer software prohibits the licensee of the software "from assigning any of its rights as a licensee with respect to the software" and that any attempt to assign such rights constitutes a default that allows "the licensor to terminate the license agreement." 11A V.I.C. § 9-408, Example 1. If the licensee, in order to obtain credit, grants a security interest in its rights under the software license to a secured party, Example 1 notes that "[u]nder [§ 9-408], the term prohibiting assignment and providing for a default upon an attempted assignment is ineffective to prevent the creation, attachment, or perfection of the security interest or entitle the licensor to terminate the license agreement." *Id.*

Analogizing Example 1 to the current situation shows that § 9-408 is inapplicable. Title 11A V.I.C. § 9-408 would be implicated if the Bank of St. Croix granted or transferred a security interest in the promissory note to a third party, but a provision in the BSC Loan (or other rule of law) prohibited the Bank of St. Croix from assigning the promissory note to a third party. In reality,

the Bank of St. Croix has not granted or transferred a *security interest* in the BSC Loan, it has purportedly "assign[ed], transfer[red], and set over the Promissory Note to [Plaintiffs]." (Dkt. No. 71-1 at 8). Moreover, the transaction at issue—in which the Bank of St. Croix "assigned" the BSC Loan to Plaintiffs who were co-obligors under the Loan—does not involve any third party. Thus, § 9-408(c) does not apply to the current situation, which does not involve the creation or transfer of a security interest in the BSC Loan or any third party.[14]

In sum, the Court finds that when Plaintiffs paid the Bank of St. Croix the consideration for the "assignment," the BSC Loan was discharged. Accordingly, the Court rejects Plaintiffs' position and related arguments that—as holders of the BSC Loan—they are entitled to interest and other costs and fees that have accrued under the BSC Loan after Plaintiffs "acquired" it.[15]

---

[14] The Court finds that Plaintiffs' additional argument that "practical realities" required Plaintiffs to purchase the BSC Note from the Bank of St. Croix does not aid their cause. Plaintiffs assert that the alternative to purchasing the BSC Loan was for Plaintiffs "to cease making the payment that [Defendant] was legally obligated to make, suffer suit for foreclosure and debt by the Bank and file a crossclaim against [Defendant], an unwieldly and anomalous result." (Dkt. No. 80 at 4). Plaintiffs, however, cannot complain of the alleged "unwieldly and anomalous result" as they willingly entered into agreements with Defendant that would, in the event of default, leave Plaintiffs with the ownership of the Property but Defendant with the liability of the BSC Loan. Also noteworthy, under this alternative option that Plaintiffs felt compelled to avoid, they would not have had an argument that they were entitled to the accrued interest and other costs and fees under the BSC Loan.

[15] In the alternative, even assuming that the BSC Loan was not discharged but continued to exist and accrue interest, Plaintiffs have nonetheless failed to demonstrate how they—as the owners of the note—incurred additional damages as a result of that interest. To the contrary, payment of interest to Plaintiffs would put them in a *better* position due to Defendant's breach, in contravention of the well-established law on damages. *David v. Scotland*, 2014 WL 11034925 at *3 (V.I. Super. Feb 3. 2014) (noting that "[n]ormally, 'damages for breach of contract have been limited to the non-breaching parties' expectation interest," *i.e.*, the position the non-breaching party would have been in but for the breach) (quoting *Mendez v. Coastal Sys. Dev., Inc.,* 2008 WL 2149373 at *14 n.15 (D.V.I. May 20, 2008)). In other words, Plaintiffs have failed to establish that Defendant's breach caused them to be damaged by the interest that purportedly accrued on the BSC Loan after Plaintiffs acquired it from the Bank of St. Croix. *See George*, 54 V.I. at 541 ("the burden is on the plaintiff to establish proximate cause between breach and damage"). Thus, even if the BSC Loan continued to accrue interest, Plaintiffs have not established how they are damaged

### 2.    Plaintiffs are Entitled to Damages
### in Connection with the BSC Loan

Having determined that Plaintiffs discharged the BSC Loan and therefore are not entitled to interest and other cost and fees under that loan, the Court now considers the amount of damages to which Plaintiffs are entitled in connection with the BSC Loan.

In his Opposition to Plaintiffs' Statement on Damages, Defendant contends that "Plaintiffs are not entitled to recover anything under the [BSC] Note, because they seek to enforce it solely in their capacity as assignees of the Bank of St. Croix and that note was discharged by the sale to two of the obligors on the note for the amount alleged to be due." (Dkt. No. 78 at 7). Defendant stresses that "Plaintiffs are before this Court as if they stepped into the shoes of the Bank of St. Croix. They are *not* before this Court as co-debtors with [Defendant] on the Bank of St. Croix note, seeking to enforce a right of contribution . . . ." (*Id.* at 1 (emphasis in original)). The Court disagrees with Defendant's position that Plaintiffs are not entitled to recover any damages under the BSC Loan.

Defendant's argument that Plaintiffs are entitled to no damages because they have stepped into the shoes of the Bank of St. Croix misses the mark. Plaintiffs' entitlement to damages regarding the BSC Loan is not dependent on their status as holders of the BSC Loan. Rather, the Court held that Defendant became liable for the BSC Loan—as between the parties—by virtue of the parties' contractual arrangements. (Dkt. No. 67 at 23 ("the Court concludes that the Settlement Agreement unambiguously states that Defendant would assume full responsibility for the BSC Loan upon exhaustion of the additional $300,00 loan from Plaintiffs, and that nothing in the Deed in Lieu of Foreclosure or the Release Agreement alters that responsibility.")). After Defendant

---

by this interest.

became responsible for the BSC Loan, however, "Plaintiffs remained borrowers of record as it relates to the Bank of St. Croix." (*Id.* at 22 n.19). In April 2013—more than two years after the maturity date of the BSC Loan had passed, but during which Defendant had failed to pay off the BSC Loan (Dkt. No. 71-1 at 4)—Plaintiffs paid off the Note, thereby discharging the debt as it relates to the parties' obligation to the Bank of St. Croix. However, Defendant's responsibility for the BSC loan pursuant to the terms of the Settlement Agreement between the parties remains.[16]

Defendant's assertion that "Plaintiffs are before this Court as if they stepped into the shoes of the Bank of St. Croix" is unavailing. (Dkt. No. 78 at 1). Defendant is correct in that, in their First Amended Complaint, Plaintiffs claim entitlement to payment of the BSC Loan based partly on the Bank of St. Croix's assignment of the BSC Loan. (*See* Dkt. No. 36 at ¶¶ 16-18).[17] However, in their First Amended Complaint, Plaintiffs also claim entitlement to payment of the BSC Loan debt based on the parties' contractual arrangement in the Settlement Agreement. (*See id.* at ¶ 10 ("In the Settlement Agreement, [Defendant] agreed that upon the disbursement of the $300,000.00 to him or to others on his account, he would become solely responsible for paying any and all indebtedness under the [BSC] Note."). Moreover, as referenced above, this Court based its finding that Defendant is liable for the BSC Loan on the parties' contractual agreements, not the fact that

---

[16] In this regard, the Court agrees with Plaintiffs' alternative argument that, even if the Court concludes that the BSC Note was, in fact, discharged by the purported assignment, Plaintiffs are nonetheless entitled to damages based on Defendant's breach of contract. (Dkt. No. 80 at 4). Plaintiffs note that the "Court's Order on summary judgment is couched in terms of contract formation by the parties, breach by [Defendant] and an entitlement to damages by [Plaintiffs]." (*Id.*). The Court agrees.

[17] Paragraphs 16-18 of the First Amended Complaint allege in relevant part that the Bank assigned the BSC Note to Plaintiffs on April 3, 2013; that on April 15, 2013, Plaintiffs notified Defendant that "he was in default of his obligations under the [BSC] Note"; and that Defendant has failed to pay "the outstanding sum under the [BSC] Note, which sum is now due and owing from [Defendant] to [Plaintiffs]." (Dkt. No. 36 at ¶¶ 16-18).

Defendant was the sole remaining obligor after the BSC Loan was "assigned" to Plaintiffs. (*See* Dkt. No. 67 at 17 ("The remaining issue, therefore, is whether the Release Agreement indicates that the parties intended that Defendant retain sole responsibility for the BSC Loan—pursuant to Section 2.1.2 of the Settlement Agreement—or whether the parties intended the Deed in Lieu of Foreclosure transfer to absolve Defendant of the obligation under Section 2.1.2 to bear sole responsibility for the BSC Loan. The Court concludes that the Release Agreement did not relieve Defendant of his obligation for the BSC Loan or transfer Defendant's responsibility for the BSC Loan to Plaintiffs.").[18]

Accordingly, the Court rejects Defendant's assertion that Plaintiffs are not entitled to damages because the BSC Note was discharged. Rather, Defendant breached his contractual obligations when he failed to assume responsibility for the BSC Loan pursuant to the terms of the parties' Settlement Agreement; Plaintiffs incurred damages as a result of this breach when they paid off the BSC Loan in order to prevent the Bank of St. Croix from foreclosing on the Property; and Plaintiffs are entitled to damages for Defendant's breach of the contractual arrangement.

### 3. Calculation of damages for the BSC Loan

As noted above, the Court finds that Plaintiffs are entitled to the damages that they incurred when they—instead of Defendant—paid off the BSC Loan's outstanding balance on April 3, 2013.

---

[18] Although the Court also notes in the Memorandum Opinion that "[Plaintiffs] purchased the rights of the BSC Loan" and that "Plaintiffs as the current owners of the loan, are entitled to a judgment as a matter of law for the debt owed on the BSC Loan" (Dkt. No. 67 at 23-24), these observations followed the arguments that both parties advanced in regards to the merits of Plaintiffs' summary judgment motion. (Dkt. No. 45 at 3-4; Dkt. No. 20 at 6 (Defendant arguing that "[Plaintiffs] are contractually obligated to 'assume' liability for the BSC loan and 'discharge' it"); Dkt. No. 52 at 2 (same)). Thus, when read in the context of the parties' arguments and the thrust of the Memorandum Opinion's analysis, these do not affect the Court's conclusion here where the Court has found that the BSC Note has been discharged.

This payment discharged the BSC Loan and any interest accruing under it after the date of the payment, and—except for 11 V.I.C. § 951[19]—Plaintiffs have failed to cite any contractual provision or legal authority that would entitle them to pre-judgment interest after April 3, 2013. Thus, Plaintiffs' damages under the BSC Loan are limited to the amount they paid to discharge it.

At the hearing, the Court asked counsel for the parties what the calculation of damages would be if the Court rejected Plaintiffs' theory that they were entitled to interest as set forth in the BSC Loan as holders of the Note, but found that Plaintiffs were entitled to damages based on Defendant's breach of contract. During the resulting colloquy with the Court, both parties agreed that, under this scenario, the damages resulting from the BSC Loan would be $1,465,132.13 (the payout amount that Plaintiffs paid the Bank of St. Croix on April 3, 2013), minus $10,079.08 in late fees assessed by the Bank of St. Croix,[20] for a total of $1,455,053.05.[21] This calculation accurately reflects the damages Plaintiffs incurred when they paid off the BSC Loan on April 3, 2013, and correctly excludes interest that purportedly accrued on the BSC Loan after that date.

---

[19] Under certain circumstances, 11 V.I.C. § 951 authorizes pre-judgment interest at the rate of 9%. However, 11 V.I.C. § 951 does not apply, *inter alia*, to "[l]oans to any entity or person for business or commercial purpose." 11 V.I.C. § 951(f)(iv). When the Court questioned Plaintiffs' counsel at the hearing regarding the applicability of 11 V.I.C. § 951(f)(iv), counsel conceded that the BSC Loan was a loan for a business or commercial purpose. Accordingly, the Court finds that 11 V.I.C. § 951 does not entitle Plaintiffs to pre-judgment interest.

[20] In their Reply to Opposition to Plaintiffs' Statement on Damages, Plaintiffs note that they are no longer seeking to recover the late fees assessed by the Bank of St. Croix. (Dkt. No. 80 at 8 ("In consideration of [Defendant's] claim that [Plaintiffs] may not have paid his monthly obligation quickly enough, thereby incurring Late Charges, [Plaintiffs] have backed out all Late Charges . . . .")).

[21] While the parties agreed what the proper calculation would be under the legal scenario set forth by the Court, neither party conceded their respective arguments that a different legal scenario should apply.

Accordingly, the Court finds that the proper amount of damages for the BSC Loan is $1,455,053.05.

### B. Amount Due under the Amended Wong/Day Loan

As noted above, in November 2012 when Plaintiffs accepted the Deed in Lieu of Foreclosure, the terms of the Release Agreement became effective. (Dkt. No. 67 at 7). In particular, Section 2.0 of the Release Agreement became effective and Defendant was released of "any and all liability and other obligations under the Wong/Day Loan Documents." (*Id.* at 6-7). However, the Court found that when Defendant violated the terms of the Release Agreement by filing his Counterclaim, Section 4.0 in the Release Agreement was triggered and Plaintiffs became "entitled to the relief set forth in [Section 4.0 of the Release Agreement], including payment by Defendant of the Amended Wong/Day Note." (*Id.* at 30).

Section 4.0 of the Release Agreement provides in pertinent part:

4.0 Notwithstanding any provision to the contrary herein or in the Deed In Lieu of Foreclosure conveying the Property to Lender, the release of the Borrower set forth in Section 2.0 hereof will be voided *ab initio* and will be of no force or effect and the Borrower shall be obligated to repay Lender the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement as of the effective date of this Agreement, together with all unpaid interest accrued at the rate provided for in the Note and any and all other charges costs and expenses provided for in the Wong/Day Loan Documents, if any one or more of the following occurs:

4.1(a) The Borrower or any person claiming by or through the Borrower commences, joins in, assists, cooperates in or participates as an adverse party or as any adverse witness (subject to compulsory legal process which requires testimony) in any suit or other proceedings against Lender or any of the other Released Parties relating to (i) the validity of the Deed In Lieu of Foreclosure, (ii) the Wong/Day Loan Documents, (iii) the BSC Loan, or (iv) any of the other indebtedness or obligations, evidenced, secured or guaranteed thereby or the Property; or . . . .

(Dkt. No. 18-3 at 16). The Court now examines Section 4.0 of the Release Agreement to determine what Defendant owes under the Amended Wong/Day Loan.

After the hearing, the Court instructed Plaintiffs to calculate the amount of damages owed under the Amended Wong/Day Loan. In their "Calculation of Amended Promissory Note to November 5, 2012, and to Date," Plaintiffs assert the total amount due and owing on the Amended Wong/Day Loan as of November 5, 2012, (the effective date of default) is $2,200,104.15. (Dkt. No. 88 at 3). After November 5, 2012, Plaintiffs assert that the Amended Wong/Day Loan continues to accrue interest at a rate of 18% per year, compounded monthly, until paid in full. (*Id.*; Dkt. No. 80 at 9).

Defendant argues that under Section 4.0 of the Release Agreement, he is only liable for the indebtedness under the Amended Wong/Day Loan, including any accrued interest, as of the effective date of the Release Agreement. (Dkt. No. 78 at 5-6). In other words, Defendant's position is that the amount due under the Amended Wong/Day Loan froze after the Release Agreement's effective date. Defendant agrees with Plaintiffs' most recent calculation of the amount due under the Amended Wong/Day Loan up to November 5, 2012, but argues that he is not liable for any interest that allegedly accrued under the Amended Wong/Day Loan after that date. (Dkt. No. 89 at 3-4).[22] While Defendant maintains that interest stopped accruing on the effective date of default, he argues that "to the extent that such interest is due [after the effective date of default], [P]laintiffs have miscalculated it." (*Id.*).

The relevant portion of Section 4.0 of the Release Agreement provides as follows: "the Borrower shall be obligated to repay Lender the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement as of the effective date of this Agreement, together with

---

[22] Defendant argues that the correct effective date of default is actually April 1, 2008, but states that "[i]f [P]laintiffs are correct that the proper effective date of default is November 5, 2012, [Defendant] concedes their conclusion that the total principal and interest due to that date is $2,200,[104.15]." (Dkt. No. 89 at 3). As set forth below, the Court rejects Defendant's argument that the effective date is actually April 1, 2008.

all unpaid interest accrued at the rate provided for in the Note and any and all other charges costs and expenses provided for in the Wong/Day Loan Documents . . . ." (Dkt. No. 18-3 at 16).

Plaintiffs argue that their calculation of the amount due under the Amended Wong/Day Loan is correct and that Defendant is liable for the interest that continues to accrue under the Amended Wong/Day Loan. (Dkt. No. 80 at 8). Plaintiffs reason that the requirement in Section 4.0 in the Release Agreement to pay is comprised of two clauses separated by a comma, each of which has an independent meaning. (*Id.*). Plaintiffs assert that the first clause (that Defendant is "obligated to repay [Plaintiffs] the indebtedness owed under the Wong/Day Loan Documents . . . as of the effective date of this Agreement") requires payment of the indebtedness as of the effective date of the Release Agreement and is retrospective. (*Id.* at 9). Plaintiffs assert that the second clause ("together with all unpaid interest accrued at the rate provided for in the Note and any and all other charges") is prospective and includes interest at the rate of 15% prior to the effective date of default and 18% interest after the effective date of default until paid in full. (*Id.*). Under Plaintiffs' theory, the interest under the Amended Wong/Day Loan did not freeze on the Release Agreement's effective date but continues to accrue until the Amended Wong/Day Loan is paid in full.

The Court first examines whether Defendant is liable for accrued interest after the effective date of the Release Agreement and, if so, when the interest stopped accruing. For the reasons set forth below, the Court does not agree with the positions advanced by the parties.

When interpreting a contract, courts "should avoid interpreting contractual language in such a way as to render any term of the contract meaningless or superfluous." *In re Combustion Eng'g, Inc.*, 366 F. Supp. 2d 224, 231 (D. Del. 2005); *see also New Castle Cty. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 174 F.3d 338, 349 (3d Cir. 1999) ("this [c]ourt takes care not to render other

portions of a provision or contract superfluous when construing contract language"); *Weary*, 2012 WL 2924122, at *7 (Hodge, J., concurring in part and dissenting in part) (noting that a "reading which renders contract provisions pointless, superfluous, or ineffective violates basic notions of contract interpretation"). The Court finds that both of the interpretations set forth by the parties contravene this principle in that the interpretations would render portions of Section 4.0 ineffective or redundant.

Looking first to Plaintiffs' position, the Court notes that Plaintiffs' interpretation of Section 4.0 fails to reconcile the fact that Section 4.0 refers to interest only in the past tense—"interest accrued." Plaintiffs fail to point to any other language in Section 4.0 that supports their position that Defendant is liable for all interest that accrues under the Amended Wong/Day Loan until paid in full. In this regard, Plaintiffs' position renders ineffective the word "accrued." At the hearing as well as in both of their written submissions, Plaintiffs rely on the fact that Defendant's obligation to pay the indebtedness and Defendant's obligation to pay accrued interest appear in different clauses. While this fact supports the proposition that each clause has an independent meaning, this fact does not support Plaintiffs' resulting conclusion that "interest accrued" must be interpreted to mean "interest that accrues until paid."

Defendant's interpretation of Section 4.0 fares no better. Defendant urges that under the language of Section 4.0, he is "liable for the indebtedness, including interest 'accrued' [past tense] or other costs and expenses, that were due *as of the effective date of the Release Agreement*." (Dkt. No. 78 at 5 (brackets and italics in original)). Under Defendant's interpretation, the clause "the Borrower shall be obligated to repay Lender the indebtedness owed under the Wong/Day Loan Documents and the Settlement Agreement" and the clause "together with all unpaid interest accrued" are both modified by "as of the effective date of this Agreement." This interpretation is

belied by the fact that the claimed "modifier" follows immediately after the first clause and is separated from the second clause by a comma. Moreover, because "the indebtedness owed under the Wong/Day Loan Documents and Settlement Agreement" necessarily includes "all unpaid interest accrued," the phrase "together with all unpaid interest accrued" is superfluous under Defendant's interpretation. Thus, this interpretation "violates basic notions of contract interpretation." *Weary*, 2012 WL 2924122, at *7.

In an attempt to avoid this result, Defendant argued at the hearing that the term "indebtedness" in Section 4.0 only means principal under the Amended Wong/Day Loan Documents and does not include interest. The Court finds this argument to be unpersuasive. When determining the meaning of any particular contractual provision, a Court must "read the contract as a whole, putting its terms in context." *Lovern*, 2015 WL 494069, at *15. Moreover, "[i]t is a general rule of contract law that where two writings are executed at the same time and are intertwined by the same subject matter, they should be construed together and interpreted as a whole, each one contributing to the ascertainment of the true intent of the parties." *Kroblin Refrigerated Xpress, Inc.*, 805 F.2d at 107.

The Release Agreement does not define the term "indebtedness," but an examination of the Settlement Agreement and the Amended Wong/Day Loan, which the parties entered into in conjunction with the Release Agreement and involve the same subject matter, show that the term "indebtedness" encompasses both unpaid principal and unpaid interest.[23] Significantly, in both the

---

[23] In further support of the fact that the Settlement Agreement, Amended Wong/Day Note, and the Release Agreement were intended to be read together, the Court notes that the Settlement Agreement states that "[t]his [Settlement] Agreement, the Deed In Lieu of Foreclosure, the Release Agreement, the Wong/Day Amended Note . . . and all the other Loan Documents embody the entire understanding, terms, and conditions of the parties with respect to the matters discussed." (Dkt. No. 18-3 at 11).

Amended Wong/Day Loan and the Settlement Agreement, the term "indebtedness" appears in the phrase "principal, interest, and other indebtedness." (Dkt. No. 18-3 at 9; Dkt. No. 71-1 at 16). For example, the Amended Wong/Day Loan specifies that upon the sale of the Property, the gross sales proceeds shall be used "to pay off the unpaid principal, interest and other indebtedness" owed under the BSC Loan and then "to pay off the unpaid principal, interest and other indebtedness owed under [the Amended Wong/Day Loan]." (Dkt. No. 71-1 at 16). Defendant's interpretation that the term "indebtedness" refers only to principal and not to interest is clearly inapt in these provisions. Rather, these provisions support the conclusion that the term "indebtedness" is a blanket term that encompasses all money owed, including principal and interest. Given that the "indebtedness" includes principal and interest, Defendant's interpretation of Section 4.0—in which indebtedness and interest accrued are both modified by effective date—renders the term "interest accrued" redundant as it would already be included in indebtedness.

In sum, the Court finds that none of the parties have set forth a reasonable interpretation of the "interest accrued" language in Section 4.0. In contrast to the parties' positions, the Court finds that phrase "interest accrued" is modified by the date of the event that triggered Section 4.0—here, the date when Defendant filed his Counterclaim. In other words, Defendant is liable for the indebtedness under the Amended Wong/Day Loan as of the effective date of the Release Agreement, and all interest that accrued under the Loan up to the date that Defendant filed his Counterclaim and triggered Section 4.0.

The Court's interpretation gives meaning to all provisions in Section 4.0 and comports with the structure and purpose of Section 4.0, which is triggered, if at all, by the occurrence of the events set forth in Section 4.1(a) through 4.1(c). Unlike Plaintiffs' interpretation, this interpretation gives meaning to the "interest accrued" language because at the time Section 4.0 is triggered, all of the

interest for which Defendant is liable has already accrued. Defendant is not liable for interest that would continue to accrue under the Amended Wong/Day Loan after Section 4.0 is triggered. Moreover, unlike Defendant's interpretation, the terms "indebtedness" and "interest accrued" are modified by different events—the effective date of the Release Agreement and the triggering event of Section 4.0, respectively. In this way, the terms have independent meaning and no parts of Section 4.0 are superfluous.

The Court's conclusion also comports with the context of the entire Release Agreement. The Release Agreement was drafted in conjunction with the Settlement Agreement so that, in the event that Defendant defaulted on his obligations, Plaintiffs could request the Deed in Lieu of Foreclosure and Defendant would be released from liability under the Amended Wong/Day Loan. Section 4.0 within the Release Agreement was drafted so that Defendant would again become liable for the indebtedness under the Amended Wong/Day Loan and the accrued interest if at any time after the effective date of the Release Agreement one or more of the events set forth in Section 4.1(a) through 4.1(c) occurred. Thus, at the time the Release Agreement was drafted, the parties intended Section 4.0 to set forth the consequence of certain potential events that would take place, if at all, after the effective date of the Release Agreement. Section 4.0 is drafted from the perspective that one of the events in Sections 4.1(a) through 4.1(c) has occurred and sets forth Defendant's resulting liability. Given this perspective and the plain language of Section 4.0, once Defendant triggered Section 4.0 he again became liable for the indebtedness of the Amended Wong/Day Note and the interest that had accrued on the indebtedness as of the date of the triggering event.[24]

_____

[24] From Defendant's position that the interest under the Amended Wong/Day Note stopped accruing on the Release Agreement's effective date, Defendant argues that "the Court should deem the effective date of the Release Agreement to be April 1, 2008." (Dkt. No. 78 at 6). Defendant

The Court notes that its interpretation is further supported by the preceding clause in Section 4.0, which states "the release of the [Defendant] set forth in Section 2.0 hereof will be voided *ab initio* and will be of no force or effect." (Dkt. No. 18-3 at 16). As noted above, Section 2.0 is the key provision in the Release Agreement that releases Defendant "from any and all liability and other obligations under the Wong/Day Loan Documents, subject to the provision of this [Release] Agreement." (*Id.* at 15). Thus, when Defendant triggered Section 4.0, the release set forth in Section 2.0 was voided, and the interest that had accrued from the effective date of the Release Agreement up to the point in time in which Section 4.0 was triggered became part of Defendant's liability.

In sum, the positions of both parties are inconsistent with the plain language of Section 4.0. Section 4.0 of the Release Agreement—when read in context with the rest of the Release Agreement, the Settlement Agreement, and the Amended Wong/Day Loan—evidences that the day that Defendant triggered Section 4.0, Defendant become liable for all of the money owed as of the effective date as well as the interest that had accrued under the Note as of the date that Section 4.0 was triggered. Accordingly, the Court rejects the parties' respective positions and their arguments supporting the same.[25]

_____

acknowledges that the Release Agreement indicates that "it is effective if the Deed in Lieu of Foreclosure is delivered to [Plaintiffs]" and that Plaintiffs requested delivery of the Deed in Lieu of Foreclosure on November 5, 2012, but asserts that Plaintiffs were *entitled* to request delivery of the Deed in Lieu of Foreclosure on April 1, 2008. (*Id.* at 6). Defendant contends that "the obligation of good faith and fair dealing inherent in every contract" should not allow the Plaintiffs to wait over four years after April 1, 2008, to demand the Deed in Lieu of Foreclosure given that—in Defendant's view—interest stopped accruing on the effective date. (*Id.*). The Court rejects Defendant's argument that the Release Agreement's effective date is April 1, 2008, as inconsistent with the language of the contract.

[25] To support his position that he is not liable for interest after the Release Agreement's effective date, Defendant also argues that the Deed in Lieu of Foreclosure was a full accord and satisfaction of the Amended Day/Wong Note. (Dkt. No. 89 at 2-3). Defendant asserts that "rather than attempt

Having determined that Defendant is liable for the interest that accrued under the Amended Wong/Day Loan up to the day he filed his Counterclaim and triggered Section 4.0, the Court now turns to the exact amount Defendant owes. As indicated above, Defendant argues in the alternative that if he is liable for interest after the effective date, Plaintiffs have miscalculated the amount. The Amended Wong/Day Loan has an initial interest rate of 15%, but after the effective date of default that rate increases to 18%. (Dkt. No. 71-1 at 16-17). Defendant argues that Plaintiffs miscalculated the interest generated after the effective date of default in that "interest accrues on the principal only at 18%" and that "the rate at which interest on the interest accrues is 15%, not 18%." (Dkt. No. 89 at 4). Defendant also asserts that "[r]ather than providing for compounding of principal and interest, [the paragraph governing the interest after the effective date of default] only provides for compounding of interest." (*Id.*). The Court disagrees with these arguments and concludes that— except for the date on which interest stopped accruing—Plaintiffs' calculation of the amount owed under Section 4.0 is correct.

At the outset, the Court notes that Defendant does not dispute the formula Plaintiffs use to calculate the amount due under the Amended Wong/Day Loan prior to the effective date. Defendant states that "[i]f [P]laintiffs are correct that the proper effective date of default is November 5, 2012, the [D]efendant concedes their conclusion that the total principal and interest due to that date is $2,200,[104.15]." (*Id.* at 3).[26] Defendant maintains, however, that Plaintiffs erred

_____

to reinstate a discharged note, the Release Agreement instead simply created a contractual obligation for [D]efendant to repay what had been owed under the [N]ote together with all unpaid interest accrued at the rate provided for in the Note." (*Id.*). The Court finds this argument to be meritless. Even assuming Defendant's characterization of the Deed in Lieu of Foreclosure is correct, as explained above, the contractual obligation created in Section 4.0 requires Defendant to pay interest that accrued at the rate provided for in the Amended Wong/Day Note as of the date that Section 4.0 was triggered.

[26] As noted above, Defendant argues that the Court should deem the effective date to be April 1,

by using this same formula (with the increased interest rate) as to the time period after the effective date of default. The Court finds that Defendant's argument is belied by the language of the two applicable paragraphs in the Amended Wong/Day Loan.

The Amended Wong/Day Loan contains two paragraphs applicable to the current inquiry. The first of these two paragraphs governs the interest rate prior to the effective date of default, while the second paragraph governs the interest rate after the effective date of default. The first paragraph states in relevant part:

> [Defendant] promises to pay . . . the principal sum of Eight Hundred Forty-two Thousand Eight Dollars ($842,008.00) or so much thereof as shall have been advanced hereunder, with interest on the unpaid principal balance from the date of drawdown of the proceeds of this Note until paid at a rate equal to fifteen percent (15.00%) per annum, compounded monthly, as is provided for herein.

(Dkt. No. 71-1 at 16). Defendant agrees that the applicable formula to calculate the amount due under the first paragraph is the following:

$A = P(1+R/n)^{nt}$

Where

- A is the final calculation of principal and interest
- P is the amount of principal
- R is the annual interest rate expressed in decimals (*e.g.* 15% = 0.15)
- n is the number of times interest is compounded annually (for monthly compounding = 12) and
- t is the number of years that interest accrues.

(Dkt. No. 89 at 1). As is clear from the language of this first paragraph and Defendant's formulaic explanation of it, only one type of interest exists—the interest that accrues on the unpaid principal. The first paragraph does not contemplate that interest accrues on anything except the unpaid

---

2008. However, the Court has rejected this argument and found that the effective date is November 5, 2012.

principal, to which interest is compounded monthly.[27] Moreover, only interest that accrues on the unpaid principal is compounded. There is no indication in either the language of the first paragraph or Defendant's formula that there is somehow a different type of compounding that applies only to the principal. (*See id.* ("n is the number of times *interest* is compounded annually) (emphasis added)).

The second paragraph, which governs the calculation of interest after the effective date of default, states the following:

> Notwithstanding any other provision contained herein and in addition to any other fee, cost or late charge payable hereunder, if any amount of principal and/or interest is not paid when due, whether at stated maturity, by acceleration or otherwise and such amount is not paid within ten (10) days after the effective date of written notice from the [Plaintiffs] to the [Defendant] (the Effective Date of Default), the interest rate accruing on the unpaid principal balance from the Effective Date of Default until paid in full shall be at a rate per annum equal at all times to eighteen percent (18.0%) per annum. The interest which is not paid when due shall be compounded monthly.

(Dkt. No. 71-1 at 16). The Court agrees with Defendant in that after the effective date of default, this second paragraph "overrides the earlier [paragraph]" that governs the accrual of interest prior to the effective date of default. (Dkt. No. 89 at 2). However, the Court notes that the interest provisions in the first and second paragraphs are essentially the same, with the notable difference being that in the second paragraph the interest rate increases from 15% to 18%. Under the second paragraph—as in the first—the only interest is that which accrues "on the unpaid principal balance." Likewise, under the second paragraph the only compounding that occurs is the monthly

---

[27] "Compound interest means interest on interest in that accrued interest is added periodically to the principal, and interest is computed upon the new principal thus formed; *it is to be distinguished from the mere allowance of interest on overdue installments of interest, which is strictly not compound interest.*" *Spiller v. Spiller*, 901 S.W.2d 553, 557 (Tex. App. 1995) (quoting 45 Am. Jur. 2d *Interest and Usury* § 76 (1969)) (quotations omitted) (emphasis in original); *see also* 44B Am. Jur. 2d *Interest and Usury* § 54 (2016) (same).

compounding of unpaid interest, which is the same as the first paragraph. Based on the language of the two paragraphs and Defendant's formulaic explanation of the first, there is simply no indication that, after the effective date of default, only interest on the principal accrues at 18%, while interest on the interest continues to accrue at 15%. Nor is there any indication that the first paragraph provides for compounding of principal *and* interest while the second only provides for the compounding of interest. Accordingly, the Court finds meritless Defendant's argument that the formula used to calculate the amount of interest prior to the effective date of default is inappropriate for the period of time after the effective date of default.

In sum, the Court finds that Defendant is liable for the indebtedness owed under the Amended Wong/Day Loan as of the Release Agreement's effective date including all interest that accrued under the Amended Wong/Day Loan up to the date that Defendant triggered Section 4.0. The Court also finds that Plaintiffs' formula for calculating interest owed after the effective date of default is accurate, except that interest stopped accruing when Defendant triggered Section 4.0 of the Release Agreement by filing his Counterclaim.

Given that the Court has rejected Defendant's legal argument to the contrary, Defendant concedes that the amount due under the Amended Wong/Day Loan as of November 5, 2012, is $2,200,104.15. (Dkt. No. 89 at 3-4). Based on the parties' agreement that the indebtedness was $2,200,104.15 on November 5, 2012, the Court now calculates what the total indebtedness was on the date Defendant filed his Counterclaim and triggered Section 4.0. To do this, the Court uses the following formula, which the parties agreed correctly calculates the indebtedness up to November 5, 2012: $A = P(1+R/n)^{nt}$. Under this formula, "A" is the final indebtedness (principal and interest) owed under the Amended Wong/Day Loan. "P" is the amount of principal as of November 6, 2012—$2,200,104.15. "R" is the annual interest rate after November 5, 2012, as expressed in

decimal—0.18. The letter "n" is the number of times interest compounds annually—12. And "t"

is the number of years that interest accrues. To calculate "t," the Court takes the number of days

between November 6, 2012, and June 16, 2013, which is the date on which Defendant filed his

Counterclaim, and divides it by the number of days in a year. (Dkt. No. 3). Thus, "t" is 223/365 =

0.611. Filling out the formula, the total indebtedness owed as of June 16, 2013, is $2,453,874.02.

In sum, the Court concludes that Defendant owes a total amount of $2,453,874.02 under

the Amended Wong/Day Loan pursuant to Section 4.0 of the Release Agreement.

### C.    Attorney's Fees, Costs, and Expenses

#### 1.    Background

In Plaintiffs' "Motion for an Award of Attorneys' Fees and Costs," Plaintiffs seek recovery

of "the full amount of attorney's fees and costs expended by them in the prosecution of this case,"

which Plaintiffs calculate to be $164,176.00 in attorney's fees and $1,634.61 in costs. (Dkt. No.

70 at 1, 5). Plaintiffs claim entitlement to attorney's fees and costs on the following three grounds:

(1) Section 6(E) of the BSC Loan; (2) the remedy provisions of the Amended Wong/Day Loan;

and (3) Title 5 V.I.C. § 541. (*Id.* at 1). Plaintiffs note that $31,256 in fees and $673.61 in costs

were incurred prior to the commencement of the litigation in association with the "declaration of

default and the conveyance of the subject property by Deed in Lieu of Foreclosure from the

Defendants to the Plaintiffs." (*Id.* at 4).

In his "Opposition to Motion for Award of Attorney's Fees," Defendant asserts that "the

only basis for [P]laintiffs to recover [attorney's fees and costs] is 5 V.I.C. § 541." (Dkt. No. 79 at

2). Referencing arguments made in his Opposition to Plaintiffs' Statement of Damages, Defendant

asserts that neither the BSC Loan nor the Amended Wong/Day Loan can serve as a basis for

attorney's fees and costs because they were both discharged. (*Id.* at 1-2).[28] As to attorney's fees and costs under 5 V.I.C. § 541, Defendant asserts that Plaintiffs are only entitled to $85,820.82 in fees and $410.00 in costs. (*Id.* at 3). Defendant contends these reductions are appropriate because Plaintiffs have failed to produce satisfactory evidence that the rates are in line with prevailing rates in the community and, therefore, the lead attorney rate should be reduced to $300 per hour and the associate attorney to $125 per hour. (*Id.*). Defendant also asserts that the attorney's fees and costs incurred prior to the commencement of the litigation are not recoverable under 5 V.I.C. § 541 and that some of the entries after the commencement of the litigation are not recoverable because they are "duplicative billing," "[i]mpermissible block billing," or unrelated to the litigation. (*See* Dkt. No. 79-1). Similarly, regarding the costs Plaintiffs seek to recover, Defendant argues that "only the court filing fee and service of process fee (totaling $410.00) is compensable." (Dkt. No. 79 at 3).

In their "Reply to Opposition to Motion for Attorney's Fees," Plaintiffs reassert their position that, in addition to their entitlement to attorney's fees and costs under 5 V.I.C. § 541, the Amended Wong/Day Loan and the BSC Loan provide a contractual basis for attorney's fees and costs. (Dkt. No. 81 at 1). Plaintiffs argue that the scope of attorney's fees and costs recoverable under the Amended Wong/Day Loan and the BSC Loan is broader than 5 V.I.C. § 541: "The language of the Notes does not limit collectability to that which is incurred during litigation, but instead expressly allows recovery for all costs, expenses and attorney's fees incurred during the collection process. Integral parts of the collection process for the [BSC Loan] included the declaration of default, the retrieval and recordation of the Deed in Lieu of Foreclosure, mitigation

---

[28] In his Opposition to Plaintiffs' Statement of Damages, Defendant argues that the BSC Note was discharged when Plaintiffs acquired it and the Amended Wong/Day Note was discharged upon the delivery of the Deed in Lieu of Foreclosure. (Dkt. No. 78 at 3-4).

of damages in the form of the attempted sale of the property, the acquisition of the [BSC Loan] and the litigation required to collect the sum due." (*Id.* at 2). Plaintiffs go on to argue that the rate of $400 per hour charged by the lead attorney, $200 per hour for the associate, and $125 for paralegals are all reasonable. (*Id.*).

At the hearing, the parties discussed the import of Section 5 in the Settlement Agreement, which requires a breaching party to indemnify the non-breaching party for the damages, costs, and expenses resulting from the breach, including attorney's fees. (Dkt. No. 18-3 at 10 ("In the event of a breach of this [Settlement] Agreement, the party to this Agreement responsible for breaching this Agreement (as determined by a court of competent jurisdiction) will indemnify and hold the others harmless from any and all resulting damages, costs, and expenses, including attorney fees."). At the hearing, the parties agreed that if Section 5 of the Settlement Agreement was effective, its scope would reach back to the declaration of default, when Plaintiffs first took legal action in response to Defendant's breach. The declaration of default occurred on November 1, 2012, when Plaintiffs delivered Certificates of Default to the escrow agent notifying the escrow agent that "[Defendant] is in continuing default of his payment obligations under Section 2 of the Settlement Agreement." (Dkt. No. 71-1 at 20-21).

## 2. Discussion

Title 5 of the Virgin Islands Code, Section 541(b), governs the award of attorney's fees in the Virgin Islands. The statute states, in pertinent part:

> The measure and mode of compensation of attorneys shall be left to the agreement, express or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may fix by way of indemnity for his attorney's fees in maintaining the action or defenses thereto . . . .

5 V.I.C. § 541(b). Here, Plaintiffs are entitled to attorney's fees by virtue of both their status as the prevailing parties in the litigation and the parties' express agreements—specifically, the Settlement

Agreement and the Amended Wong/Day Note.[29] Because both the Settlement Agreement and the Amended Wong/Day Note are to be construed in accordance with the laws of the Virgin Islands (Dkt. No. 18-3 at 11; Dkt. No. 71-1 at 19), the Court will look principally to the case law interpreting 5 V.I.C. § 541(b) to determine what attorney's fees are "reasonable" and, therefore, recoverable. *Arrow-Pocono Lines, Inc. v. Land*, 2016 WL 2637819, at *5 (D.V.I. May 6, 2016) (ruling that because a mortgage entitling the plaintiff to attorney's fees and expense was "subject to the laws of the U.S. Virgin Islands . . . the Court will look to the body of case law interpreting 5 V.I.C. § 541(b) for guidance in assessing attorney's fees").

The Court undertakes a two-step inquiry when examining the reasonableness of attorney's fees. First, the Court determines whether the hours billed were "reasonably expended," excluding time billed that is "excessive, redundant, or otherwise unnecessary." *Berne Corp. v. Gov't of Virgin Islands*, 2012 WL 369535 at *10 (D.V.I. Feb. 3, 2012) (quoting *Pub. Interest Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1188 (3d Cir. 1995)). Second, the Court determines whether the hourly rate sought is reasonable, in comparison to prevailing market rates in the relevant community "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990); *Loughner v. Univ. of*

---

[29] Plaintiffs' argument that they are entitled to attorney's fees and costs under the BSC Loan fails in light of the Court's finding that Plaintiffs discharged the BSC Loan when they paid to the Bank of St. Croix the full amount of indebtedness. Accordingly, Plaintiffs are not "holders" of the BSC Loan and are, therefore, not entitled to any attorney's fees under its provisions. Plaintiffs *are* entitled to attorney's fees under the Amended Wong/Day Loan, which provides that "[i]n the event of any default in the payment of this Note, and if the same is referred to an attorney at law for collection or any action at law or in equity . . . [Defendant] shall pay the [Plaintiffs] all expenses and costs, including, but not limited to, attorney's fees and court costs." (Dkt. No. 71-1 at 17). However, the Court finds that any fees that would be recoverable under the Amended Wong/Day Note would also be recoverable under the Settlement Agreement. Thus, the Court focuses its analysis to Plaintiffs' entitlement under the Settlement Agreement and § 541.

*Pittsburgh*, 260 F.3d 173, 180 (3d Cir. 2001); *Berne Corp.*, 2012 WL 369535 at *10.

### i. Hours Billed

The Court looks first at whether the hours billed were reasonably expended and disallows those that are not. As an initial matter, the Court will disallow those attorney's fees that arise from work performed by paralegals.[30] As noted above, Plaintiffs' entitlement to attorney's fees is grounded in the law of the Virgin Islands because their entitlement arises from 5 V.I.C. § 541 and certain agreements (the Settlement Agreement and the Amended Wong/Day Loan) that are to be interpreted according to Virgin Islands law. As such, this Court is guided by the interpretation of local courts regarding whether certain types of fees—such as those generated by paralegals—are recoverable. There is no clear indication from local courts in the Virgin Islands that fees generated by paralegals constitute "attorney's fees." *See Matrix Fin. Services Corp. v. Laurent*, 2016 U.S. Dist. LEXIS 62263, at *13 (D.V.I. May 11, 2016) (disallowing attorney's fees generated by paralegals after noting that "the local courts have not given a clear indication that such fees are allowable"); *Mahabir v. Heirs of George*, 2014 V.I. LEXIS 20, *3 (V.I. Super. Ct. Apr. 4, 2014) ("Defendant has provided no argument or case law demonstrating that 5 V.I.C. § 541(b) stands for the proposition that a prevailing party may obtain law clerk or paralegal fees as part of its award of attorney's fees. Other courts in the Virgin Islands have denied similar fees on this basis."). Accordingly, the Court will disallow the 10.2 hours of work billed by paralegals.[31]

---

[30] The exhibit Plaintiffs attach to their Motion for Attorney's Fees and Costs does not specify whether a particular individual is an attorney or paralegal. (Dkt. No. 70-1). However, in their Reply, counsel for Plaintiffs argues that his associate's hourly rate of $200 was below market and that the "hourly rate of $125 for an experienced paralegal is at market." (Dkt. No. 81). Based on these representations of Plaintiffs' counsel, the Court infers that those individuals billing at a rate of $125 per hour are paralegals.

[31] Specifically, the Court disallows entry numbers 5, 8, 12, 50, 53, 77, and 90, which together total 10.2 hours of work. (Dkt. No. 79-1 at 1-2, 4, 6-7; Dkt. No. 70-1 at 3, 5, 17-18, 23-24). The hourly rate billed for these 10.2 hours is $125 for a total of $1,275. (Dkt. No. 70-1 at 3, 5, 17-18, 23-24).

The Court next examines those attorney's fees that were generated prior to November 1, 2012, and determines that they will also be disallowed. In accordance with the agreement of the parties expressed at the hearing, the Court finds that November 1, 2012—the date of the declaration of default—is the date on which Plaintiffs' entitlement to attorney's fees and expenses under Section 5 of the Settlement Agreement commenced. Prior to that date, Defendant was under no obligation under Section 5 to indemnify Plaintiffs for damages resulting from a yet unannounced breach.[32] Likewise, the fees incurred prior to November 1, 2012, are not within the scope of § 541(b) because they are not necessary to the litigation, the Complaint in which was not filed until April 30, 2013. (*See* Dkt. No. 1). Thus, the Court will disallow nine hours from Attorney Kevin Rames that were billed prior to November 1, 2012, at the reduced hourly rate of $300,[33] for a total amount of $2,700. (*See* Dkt. No. 79-1 at 1; Dkt. No. 70-1 at 3).[34]

The Court also finds that some of the attorney's fees Plaintiffs incurred after November 1, 2012, were not reasonably expended and will therefore be disallowed. Several of the attorney's fees Plaintiffs request are based on property management or the attempted sale of the Property. Such fees are related to neither the litigation nor the breach of the Settlement Agreement. For

---

[32] Plaintiffs argue that under the BSC Loan and the Amended Wong/Day Note they are entitled to attorney's fees prior to November 1, 2012. This argument is without merit. As set forth above, Plaintiffs are not holders of the BSC Loan and are not entitled to attorney's fees under it. Plaintiffs' reliance on the Amended Wong/Day Note is similarly unavailing. While Section 4.0 of the Release Agreement entitles Plaintiffs to "any and all other charges, costs, and expenses provided for in the Wong/Day Loan Documents," (Dkt. No. 18-3 at 16), Section 4.0 of the Release Agreement was not triggered until June 16, 2013—when Defendant filed his Counterclaim. Thus, the Amended Wong/Day Note does not entitle Plaintiffs to attorney's fees prior to June 16, 2013.

[33] As set forth below, the Court has reduced the hourly rate of Plaintiffs' lead counsel, Attorney Kevin Rames, from $400 to $300.

[34] Specifically, the Court disallows the fees designated at entry numbers 1-4 and 6. (Dkt. No. 79-1 at 1; Dkt. No. 70-1 at 3).

example, Plaintiffs request attorney's fees incurred for reviewing "emails regarding the WAPA authorization;[35] email to Hodge and Groner regarding Tampering Fee," and various correspondence with the owner of a vacation rental company. (Dkt. No. 79-1 at 2).[36] Other requested fees appear to involve 132 Green Cay LLC, which was apparently created to hold ownership of the Property, and a potential sale of the property to Phil Arcidi. (*See id.* at 5 (noting a bill incurred on June 18, 2013, was for time spent reviewing an email "regarding the Arcidi inspection report, appraisal, contractor")). Such fees reflect activities stemming from ownership of the Property. While the Settlement Agreement requires Defendant to indemnify Plaintiffs from "damages, costs, and expenses, including attorney fees" resulting from Defendant's breach, it does not require Defendant to continue paying for the incidental expenses associated with the ownership and attempted sale of the Property. Likewise, these fees are unnecessary to the current litigation and thus do not fall within the scope of § 541. Accordingly, the Court will disallow 9.2 hours that Attorney Rames billed in the amount of $2,760 that reflect time that was spent on tasks that are related to neither the litigation nor the breach of the Settlement Agreement.[37]

Similarly, Plaintiffs request attorney's fees that are duplicative or were unnecessarily generated. For example, on March 13, 2013, Plaintiffs incurred attorney's fees of $1,900 relating to drafting the Deed in Lieu of Foreclosure, the Stipulated Judgment of Foreclosure, and the Environmental Indemnification Agreement. (Dkt. No. 79-1 at 3 (entry number 29); Dkt. No. 70-1

---

[35] "WAPA" is a common acronym for U.S. Virgin Islands Water and Power Authority.

[36] In his Opposition, Defendant represents that "Marti Gotts is the owner of Vacation St. Croix, a vacation rental company." (Dkt. No. 70 at 5). Plaintiffs do not contest this allegation in their subsequent Reply. (Dkt. No. 81).

[37] These hours, to which the Court has applied the reduced hourly rate of $300, are designated at entry numbers 13, 17, 19-25, 39, 61, 66, 70, 71, 83, and 84. (Dkt. No. 79-1 at 2-3, 5, 7; Dkt. No. 70-1 at 5-6, 8, 10, 15, 19-21, 23).

at 14). However, as Defendant points out in his Opposition, the Deed in Lieu of Foreclosure was already held in escrow and had been executed since November 2006. (Dkt. No. 18-3 at 33-34). In their subsequent Reply, Plaintiffs fail to respond to Defendant's challenge and explain how the Deed in Lieu of Foreclosure drafted by Plaintiffs' counsel in March of 2013 was not duplicative of the one being held in escrow. Plaintiffs also fail to explain what importance, if any, the Stipulated Judgment of Foreclosure and the Environmental Indemnification Agreement served. Accordingly, the Court will disallow these and similar attorney's fees at entry numbers 29, 57, and 129 because they reflect duplicative or unnecessary work both in the context of the Settlement Agreement and § 541. These entries constitute a total of 7.2 hours billed by Attorney Rames at the reduced hourly rate of $300 for a total amount of $2,160.[38]

Finally, the Court finds that some of Plaintiffs' attorney's fees must be disallowed in whole or in part because they are recorded in a block billing format in which a single bill is comprised of both activities that are not recoverable (usually because they are unrelated to the litigation and Settlement Agreement) and activities that otherwise would be recoverable.[39] As this Court has previously noted, "billing entries that are too general, in that they do not indicate the purpose for which the attorney engaged in particular work, will not be allowed. A prevailing party must

---

[38] Entry number 57 is the last of three occasions in which Plaintiffs seek attorney's fees associated with the summons for Defendant. (Dkt. No. 79-1 at 4-5). Entry number 129 reflects $900 in fees associated with Attorney Rames reviewing the Court order granting Plaintiffs' Motion to Amend their Complaint and "prepar[ing] and fil[ing] First Amended Complaint." (*Id.* at 10). As noted by Defendant, however, the Amended Complaint had already been drafted for inclusion in Plaintiffs' Motion to Amend their Complaint. (*Id.*).

[39] "Block billing is a time-keeping method by which each lawyer and legal assistant enters the total time daily spent working on a case, rather than itemizing the time expended on specific tasks." *United States v. NCH Corp.*, 2010 U.S. Dist. LEXIS 94486, at *19 (D.N.J. Sep. 10, 2010) (quoting *Brown v. City of Pittsburgh*, 2010 WL 2207935, at *8 n.12 (W.D. Pa. May 27, 2010)) (quotations omitted).

provide enough specificity in its billing entries to allow a court to assess what tasks an attorney performed when examining an application for attorney's fees." *Pollara v. Ocean View Inv. Holding LLC*, 2015 WL 4735205, at *2 (D.V.I. May 21, 2015) (quoting *M & N Aviation, Inc. v. United Parcel Serv., Inc.*, 2014 U.S. Dist. LEXIS 37382, at *18 (D.V.I. Mar. 21, 2014)) (brackets and quotations omitted); *see also NCH Corp.*, 2010 U.S. Dist. LEXIS 94486, at *24 ("a party block bills at his own peril" (quoting *Estate of Schultz v. Potter*, 2010 WL 883710, at *7 n.14 (W.D. Pa. Mar. 5, 2010))) (quotations omitted).

Here, some of Plaintiffs' entries lack the requisite specificity to enable the Court to determine how much time Plaintiffs' counsel spent on allowable tasks. For example, on July 9, 2013, Attorney Rames billed $1,360 for the following activities:

> Review Arcidi Inspection Report, review [Defendant] Voluntary Rule 26 Disclosures; prepare and submit Rule 26 Disclosures; review and email Sales Agreement and Inventory to client; exchange of emails with Hunt Logan regarding allowing Arcidi contractor access to the property

(Dkt. No. 79-1 at 7). While reviewing, preparing, and submitting Rule 26 disclosures are clearly related to the litigation, reviewing the Arcidi Inspection Report, the "Sales Agreement and Inventory," and correspondence regarding the Arcidi contractor's access to the Property are activities that arise from the ownership of the Property rather than the breach of the Settlement Agreement or the resulting litigation. Because of the block-billing format, however, it is impossible for the Court to precisely determine how much of the total amount billed is attributable to the Rule 26 disclosures (and is recoverable) and how much is attributable to the management and attempted sale of the Property (which is not recoverable). *See Devcon Int'l Corp. v. Reliance Ins. Co.*, 2008 U.S. Dist. LEXIS 1087, at *7 (D.V.I. Jan. 2, 2008) (disallowing certain fees and noting that "undifferentiated entries hinder the Court in determining whether the time spent on each of the listed activities was reasonable" (quoting *Morcher v. Nash*, 32 F. Supp. 2d 239, 243

(D.V.I. 1998) (reducing time spent on undifferentiated entries by 50%))) (quotations omitted).

Accordingly, the Court will disallow all or a portion of the fees claimed in entries that are comprised of both recoverable and non-recoverable tasks. Specifically, entry numbers 60, 67, 74, 81, 82, and 95, which constitute a total of 19.05 hours billed by Attorney Rames at the reduced hourly rate of $300 per hour for a total of $5,715, will be disallowed in their entirety because it appears that a significant portion of these entries are comprised of non-recoverable tasks. (Dkt. No. 79-1 at 5-7; Dkt. No. 70-1 at 19-20, 22-23, 25). The time associated with entry numbers 26, 59, 75, 89, and 187 will be reduced by thirty percent because these entries contain at least one non-recoverable task. This results in a disallowance of 0.69 hours billed by Attorney Johnson in the amount of $138 and 4.905 hours billed by Attorney Rames at the reduced rate of $300 per hour for a total amount of $1,471.50. (Dkt. No. 79-1 at 3, 5-7, 12; Dkt. No. 70-1 at 12, 18, 22, 24, 43).

### ii. Hourly Rates

Turning to the hourly rate charged by Plaintiffs' counsel, "Virgin Islands courts 'have generally concluded that a reasonable hourly rate in this jurisdiction spans from $125 to $300 per hour.'" *Arrow-Pocono Lines, Inc.*, 2016 WL 2637819, at *5 (quoting *Anthony on Behalf of Lewis v. Abbott*, 2012 WL 2752154, at *3 (D.V.I. July 9, 2012)); *see also Pollara*, 2015 WL 4735205, at *3. In their Motion for an Award of Attorney's Fees and Costs, Plaintiffs note that their lead attorney's fees of $400 per hour "is at the high end of attorneys' fees in the local bar, but is not out of the proper range for a senior attorney with thirty years of experience in both litigation and commercial transactions, given that this matter had key aspects of both disciplines." (Dkt. No. 70 at 5).

Notwithstanding the stated experience of Plaintiffs' counsel, "[t]he burden rests on a fee applicant to produce satisfactory evidence, in addition to counsel's own affidavits, that the rates sought are in line with prevailing rates in the community for similar services, by lawyers of

reasonably comparable skill, experience, and reputation." *Pollara*, 2015 WL 4735205, at *3 (citing *Carey v. City of Wilkes–Barre*, 496 Fed. Appx. 234, 236 (3d Cir. 2012)). In this case, the only "evidence" Plaintiffs provide for their proposition that their counsel's rates are in line with prevailing rates in the community is a Verification attached to their Motion for Attorney's Fees and Costs. (Dkt. No. 70-2). In the Verification, Plaintiffs' lead counsel, Attorney Rames, avers that the invoices for attorney's fees and costs attached to the Motion for Attorney's Fees and Costs "are correct and accurate"; that the legal services "were actually and necessarily performed"; and that the costs "were actually and necessarily incurred." (*Id.*). In Plaintiffs' Reply to Opposition to Motion for Attorney's Fees and Costs, Plaintiffs represent that "[they] adopt the statements of counsel in the Verification." (Dkt. No. 81 at 2).

The Court finds that Counsel's Verification falls far short of carrying Plaintiffs' burden "to produce satisfactory evidence, in addition to counsel's own affidavits, that the rates sought are in line with prevailing rates in the community for similar services." *Pollara*, 2015 WL 4735205, at *3. Of note, nowhere in the Verification does Plaintiffs' counsel indicate that the rate of $400 per hour is in line with prevailing rates in the community. (Dkt. No. 70-2). More important, there is nothing—other than Counsel's Verification—to which the Court can look for evidence of the prevailing rate in the community. Because Plaintiffs have failed to produce satisfactory evidence that their lead counsel's fee of $400 per hour is reasonable, when compared to prevailing rates in the Virgin Islands, the Court will reduce the rate to $300 per hour. *See Arrow-Pocono Lines, Inc.*, 2016 WL 2637819, at *5-6 (reducing attorney's hourly rate from $350 per hour to $300 per hour because the plaintiff and its attorney "provided no support for the proposition that [$350 per hour] is reasonable in comparison to prevailing market rates in the Virgin Islands"); *Pollara*, 2015 WL 4735205, at *1, 4 (reducing one attorney's hourly rate from $500 per hour to $300 per hour in part

because "[p]laintiff's attorneys provide[d] only their own affidavits indicating that their rates are in line with prevailing rates in the jurisdiction. This is not sufficient to support the high hourly rates claimed"); *WDC Miami Inc. v. NR Elec., Inc.*, 2015 WL 127852, at *4 (D.V.I. Jan. 8, 2015) ("Because counsel has provided no justification for an hourly rate above the $300.00 per hour rate that has been generally deemed to be the maximum reasonable rate in this jurisdiction, the Court will award fees at a rate of $300.00 per hour.").

In addition to the hourly rate of Attorney Rames, the Court must also consider whether the hourly rate of $200 is reasonable for associate attorney Semaj Johnson. Defendant argues that Attorney Johnson's rate of $200 per hour should be reduced to $125 per hour because Plaintiffs— as with the hourly rate of Attorney Rames—produced no evidence that a rate of $200 per hour is reasonable. (Dkt. No. 79 at 2-3). Indeed, Plaintiffs rely on the arguments presented in their Reply that $200 per hour is a reasonable rate. Specifically, Plaintiffs state that the rate of $200 for Attorney Johnson is "below market, given his experience of five years as a federal court clerk and three years as an associate in [his current] firm." (Dkt. No. 81 at 2).

The Court finds that the $200 per hour rate for Attorney Johnson is "in line with prevailing rates in the community for similar services" and rejects Defendant's argument to the contrary. *Pollara*, 2015 WL 4735205, at *3. Notwithstanding that Plaintiffs have failed to produce evidence outside of their own representations in their Reply, the Court notes that the requested fee of $200 per hour is squarely within the $125 to $300 range of reasonable rates within this jurisdiction. *Arrow-Pocono Lines, Inc.*, 2016 WL 2637819, at *5. Given Plaintiffs' representation that Attorney Johnson has eight years of experience, the Court does not agree that his hourly rate should be reduced to $125 per hour—the lowest amount in the range of rates deemed reasonable in this

jurisdiction.[40] Rather, the Court will apply the rate of $200 per hour to all of the time billed by Attorney Johnson.[41]

### iii. Attorney's Fees Conclusion

In sum, the Court finds that 60.245 hours of attorney's fees that Plaintiffs request were not reasonably expended and are therefore not recoverable. The Court also finds that Plaintiffs have failed to carry their burden of showing that $400 per hour for Attorney Rames is "in line with prevailing rates in the community for similar services" and has reduced the hourly rate of Attorney Rames to $300 per hour. *Pollara*, 2015 WL 4735205, at *3. The Court finds that Attorney Johnson's hourly rate of $200 is reasonable, and all of his time will be charged at that rate. Applying all of the Court's findings, Plaintiffs will be awarded $114,185.50 in attorney's fees.

---

[40] In support of the contrary position, Defendant cites *Pollara* in which the court reduced the hourly rates of several attorneys to $125 per hour. (Dkt. No. 79 at 2-3). The Court in *Pollara* reduced the hourly rates of unidentified attorneys (associates) from $250 per hour to $125 per hour because the "[p]laintiff's breakdown of fees [did] not provide any information about the [unidentified attorneys] that would justify their claimed rate of $250 per hour." *Pollara*, 2015 WL 4735205, at *4. However, unlike the unidentified attorneys in *Pollara*, Plaintiffs have provided specific information regarding the eight years of experience that Attorney Johnson possesses. (Dkt. No. 81 at 2 (noting Attorney Johnson's experience of "five years as a federal court clerk and three years as an associate in [his current] firm")). Thus, the ruling herein is not contrary to *Pollara*. In fact, the decision in *Pollara* supports the Court's ruling. The Court in *Pollara* reduced the hourly rate of another attorney (associate) with eight years of experience from $350 to $200. *Id.* at *1, *4. As here, the Court in *Pollara* found that an hourly rate of $200 for an associate with eight years of experience was reasonable, even though the plaintiffs "provide[d] only their own affidavits indicating that their rates are in line with prevailing rates in the jurisdiction." *Id.* at *4.

[41] Despite the representations of Attorney Rames in Plaintiffs' Reply that Attorney Johnson's rate is $200 per hour, the Court notes that at some point during the litigation, Attorney Johnson began billing at the rate of $225 per hour. (*See* Dkt. No. 70-1 at 32). In light of the representations of Attorney Rames and the lack of any argument from Plaintiffs that Attorney Johnson's $225 hourly rate is reasonable, the Court will reduce to $200 per hour all instances in which Attorney Johnson bills at $225 per hour.

### iv. Costs and Expenses

In addition to attorney's fees, Plaintiffs also seek reimbursement for costs of $1,634.61. Defendant asserts that only $410 of Plaintiffs' requested costs is compensable and that Plaintiffs may not recover the remaining costs relating to "[m]ediation fees . . . tax clearance letters, attestation of deeds, recordation of deeds, postage (except for service of process), courier charges, or title searches." (Dkt. No. 79 at 3). Plaintiffs maintain that "[Defendant's] agreement to pay . . . costs in this matter is contractual." (Dkt. No. 81 at 1).

Under Virgin Islands law, 5 V.I.C. § 541(a) defines what costs are recoverable in a civil action.[42] Additionally, as discussed above, Section 5 in the Settlement Agreement requires a breaching party to "indemnify and hold the others harmless from any and all resulting damages, costs, and expenses, including attorney fees," and Section 10 of the Settlement Agreement states that the "Agreement shall be construed in accordance with the laws of the U.S. Virgin Islands." (Dkt. No. 18-3 at 10-11).[43] The terms "damages" and "expenses" are not defined by statute, nor are they defined in the Settlement Agreement. In Black's Law Dictionary, "damages" are defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Damages*, BLACK'S LAW DICTIONARY (10th ed. 2014). "Expenses" are defined as "[a]n

---

[42] Specifically, 5 V.I.C. § 541(a) permits the following costs: "(1) Fees of officers, witnesses, and jurors; (2) Necessary expenses of taking depositions which were reasonably necessary in the action; (3) Expenses of publication of the summons or notices, and the postage when they are served by mail; (4) Compensation of a master as provided in Rule 53 of the Federal Rules of Civil Procedure; (5) Necessary expenses of copying any public record, book, or document used as evidence on the trial; and (6) Attorney's fees as provided in subsection (b) of this section." 5 V.I.C. § 541(a).

[43] As noted above, Plaintiffs are also entitled to costs under the Amended Wong/Day Note, but any costs or expenses that would be recoverable under the Amended Wong/Day Note would also be recoverable under the Settlement Agreement.

expenditure of money, time, labor, or resources to accomplish a result . . . ." *Expense*, BLACK'S LAW DICTIONARY (10th ed. 2014).

The $1,634.61 in overlays that Plaintiffs seek to recover is styled as costs or expenses rather than damages, as Plaintiffs do not assert that their entitlement to $1,634.61 arises from a loss or injury. Accordingly, the Court considers only whether the $1,634.61 is properly recoverable as costs or expenses.[44]

Because the Settlement Agreement is to be "construed in accordance with the laws of the U.S. Virgin Islands" (Dkt. No. 18-3 at 10-11), the Court will look to the law of the Virgin Islands when determining what costs and expenses are recoverable. *Matrix Fin. Services Corp.*, 2016 U.S. Dist. LEXIS 62263, at *14. Regardless of whether the $1,634.61 that Plaintiffs seek to recover is styled as a cost under the statute or an expense under the Settlement Agreement, only reasonable costs and expenses are recoverable. *Id.* at *16 ("In order for costs [under the statute] to be reimbursed, they must be reasonable. Similarly, in order for expenses (under the contract) to be reimbursed, they must also be reasonable.") (citation omitted).

Defendant concedes—and the Court agrees—that Plaintiffs are entitled to recover the $410 in costs associated with the Service of Process and the Filing Fee for the Complaint. (Dkt. No. 79 at 3). Accordingly, the Court turns its attention to the remaining "expenses" sought by Plaintiffs, none of which fit within the statutory definition of "costs." 5 V.I.C. § 541(a). In this regard, the Court examines whether the remaining expenses Plaintiffs seek pursuant to the Settlement Agreement are reasonable under Virgin Islands law.

---

[44] The Supreme Court of the Virgin Islands has opined that costs and expenses do not cover the same outlays of funds in a case. *Terrell v. Coral World*, 55 V.I. 580, 2011 WL 3492575 (V.I. July 20, 2011).

Plaintiffs seek expenses of $652.50 associated with tax clearance, attestation of a deed, and recordation of a deed. Although not specifically noted, given that all three of these charges were incurred in November 2012, the Court associates these charges with the Deed in Lieu of Foreclosure that Plaintiffs obtained after they delivered the Certificates of Default to the escrow agent on November 1, 2012. These expenses arose directly from Defendant's breach of the Settlement Agreement and the subsequent transfer of the Property to Plaintiffs. Accordingly, the Court finds that the $652.50 is reasonable under Section 5 of the Settlement Agreement and will be allowed. *See Matrix Fin. Services Corp.*, 2016 U.S. Dist. LEXIS 62263, at *16 (interpreting a mortgage that entitled the bank to collect all expenses incurred and noting that "expenses related to title search, filing, recording, and process server fees are reasonable under the contract and will be allowed").

In contrast, Plaintiffs also seek $146 for "Updated Title Search – Plot 132 Estate Green Cay," which has no apparent relation to the instant litigation or to the breach of the Settlement Agreement. (Dkt. No. 70-1 at 21). The expense for this updated title search was incurred on June 3, 2013—more than six months after Plaintiffs acquired the Property. Unlike the expenses incurred in November 2012, which arise directly from Defendant's breach of the Settlement Agreement and the subsequent transfer of the Property, the updated title report arises from Plaintiffs' ownership of the Property. Because this expense does not result from Defendant's breach, it is not a reasonable expense under the contract and will be disallowed.

Plaintiffs also seek $375 for costs associated with mediation services the parties apparently utilized in this litigation. However, "[m]ediation costs are not among the costs listed in 5 V.I.C. § 541, and are typically disallowed." *Solis v. V.I. Tel. Corp.*, 2016 U.S. Dist. LEXIS 20668, at *4 (D.V.I. Feb. 18, 2016) (quoting *M & N Aviation, Inc.*, 2014 U.S. Dist. LEXIS 37382, at *13)

(quotations omitted). Indeed, in *Ryan v. Ryan*, 53 V.I. 140, 147 (Super. Ct. 2010), the Virgin Islands Superior Court articulated policy considerations that weigh against requiring one party to bear the other party's mediation expenses: "[A]llowing for the shifting of mediation fees may provide a disincentive for parties to enter into mediation freely and inhibit their endeavor to resolve their differences. Such a result would undermine the mediation process . . . ." *Id.* Nonetheless, the mediation expenses here are a necessary outgrowth of the litigation that arose from the breach of the Settlement Agreement. (*See* Dkt. No. 25 (the Court's Rule 16 Scheduling Order requiring mediation)). In this regard, such expenses are a direct result of Defendant's breach of the Settlement Agreement. Accordingly, the Court finds that the $375 in mediation expenses is reasonable under the Settlement Agreement and is therefore recoverable.

The remaining $51.11 that Plaintiffs seek arises from expenses associated with courier services and postage.[45] However, it is well-established that costs associated with postage and courier services are not recoverable under the statute. *Matrix Fin. Services Corp.*, 2016 U.S. Dist. LEXIS 62263, at *16 ("[I]t is well-established that 'overhead costs,' such as postage, are not compensable under § 541. Neither are messenger service fees.") (omitting citation).[46] Moreover, Plaintiffs fail to give any indication as to the purpose of the postage and courier services and, importantly, whether they were used in connection with Defendant's breach of the Settlement

---

[45] Specifically, Plaintiffs incurred $6.11 in postage on April 15, 2013, and $15 in courier charges on three separate occasions—April 30, 2013, October 30, 2013, and August 20, 2014. (Dkt. No. 70-1 at 17, 32, 51).

[46] Postage and courier service charges may be compensable under § 541(a)(3) if such charges are incurred in connection with the service of the summons or notices. However, given that Plaintiffs incurred costs associated with the service of process on June 1, 2013, the postage and courier services charges at issue here, which were incurred on April 15, 2013, April 30, 2013, October 30, 2013, and August 20, 2014, do not appear connected to the service of the summons in the instant case. Plaintiffs give no indication to the contrary.

Agreement. Accordingly, the Court finds that the $51.11 in expenses for postage and courier services are not reasonable under the Settlement Agreement and will be disallowed. *See id.* (holding that postage and messenger service fees are non-compensable under a mortgage that entitled the bank to collect "all expenses incurred").

In sum, after deducting those costs that are not contemplated by the statute and those expenses that are not reasonable under the Settlement Agreement, the Court will reduce Plaintiff's request of $1,634.61 by $197.11 and award Plaintiffs $1,437.50 in costs and expenses.

### D.    Post-Judgment Interest

Under 28 U.S.C. § 1961, "[i]nterest shall be allowed on any money judgment in a civil case recovered in district court. . . . Such interest shall be calculated from the date of the entry of judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." 28 U.S.C. § 1961(a). Accrual of post-judgment interest is automatic. *Christian v. Joseph*, 15 F.3d 296, 298 (3d Cir. 1994) (noting that "28 U.S.C.A. § 1961(a) (West Supp. 1993), does not specifically provide for automatic accrual of post-judgment interest, yet it has been uniformly interpreted to do so"). Although this Court is sitting in diversity, the federal post-judgment interest statute still applies. *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530, 548 (3d Cir. 1988) ("The matter is governed by 28 U.S.C. § 1961 notwithstanding that this is a diversity action."); *Geiss v. Target Corp.*, 2015 WL 5227620, at *2 (D.N.J. Sept. 8, 2015) ("Post-judgment interest in federal court is governed by 28 U.S.C. § 1961, even in matters arising under diversity jurisdiction.").

Defendant owes $2,453,874.02 under the Amended Wong/Day Loan and $1,455,053.05 under the BSC Loan, for a total amount of $3,908,927.07 for the period up to and including June

12, 2017—the date this Order is issued. Beginning on June 13, 2017, the total amount of $3,908,927.07 shall accrue post-judgment interest at the federal statutory rate, pursuant to 28 U.S.C. § 1961(a), until the entire judgment is satisfied. Similarly, Defendant owes $114,185.50 in attorney's fees and $1,437.50 in costs and expenses, for a total amount of $115,623 for the period up to and including June 12, 2017. Beginning on June 13, 2017, the total amount of $115,623 shall accrue post-judgment interest at the federal statutory rate, pursuant to 28 U.S.C. § 1961(a), until the entire judgment is satisfied.

## IV.  CONCLUSION

For the foregoing reasons, including those set forth in the Court's September 30, 2015 Memorandum Opinion, the Court will enter judgment in Plaintiffs' favor for a total of $3,908,927.07 in damages, which is comprised of $1,455,053.05 associated with the BSC Loan and $2,453,874.02 associated with the Amended Wong/Day Loan pursuant to Section 4.0 of the Release Agreement. Additionally, the Court will grant in part and deny in part Plaintiffs' Motion for an Award of Attorneys' Fees and Costs, and will award Plaintiffs $114,185.50 in attorney's fees and $1,437.50 in costs and expenses. Post-Judgment interest shall accrue on the damages and attorney's fees awards at the federal statutory rate, pursuant to 28 U.S.C. § 1961(a), from June 13, 2017 until the entire judgment is satisfied.

An appropriate Order accompanies this Opinion.

Date:  June 12, 2017                                         _____/s/_____
                                                            WILMA A. LEWIS
                                                            Chief Judge